## LEMONS *v.* STATE.

### (*Knoxville.* November 7, 1896.)

1. MURDER. *Facts that support verdict for murder in first degree.*

    The Court, upon the facts recited in the opinion, sustains a verdict for murder in the first degree. (*Post, pp. 561–569.*)

2. ALIBI. *Rules as to.*

    Proof of *alibi* must cover the entire time of the transaction, for if it be possible that the prisoner could have been at both places, the proof is valueless. It is proper for the Court to caution the jury against the abuses to which this defense is exposed. (*Post, pp. 563–566.*)

    Case cited and approved: Thompson *v.* State, 5 Hum., 138.

3. OATH OF OFFICER. *Record recital.*

    A recital of the record in a felony case that the officer placed in charge of jury " was sworn according to law," is sufficient. (*Post, pp. 569, 570.*)

    Case cited and approved: Lancaster *v.* State, 91 Tenn., 267.

4. DYING DECLARATIONS. *Admissible, when.*

    A dying declaration which appears from the whole evidence in the case, taken together, to have been made under a solemn sense of impending dissolution, is admissible. (*Post, pp. 570–572.*)

    Case cited and approved: Curtis *v.* State, 14 Lea, 502.

5. EVIDENCE. *Of death in murder case.*

    It is not essential that the State should, in a murder trial, prove by expert testimony that the death resulted from the wounds, when there is no suggestion of death from any other cause, and the deceased was shown to have been of previous good health, and that his wounds were mortal, and that he received proper medical treatment. (*Post, p. 571.*)

Lemons v. State.

6. CRIMINAL PRACTICE. *Representation of defendant by counsel.*

The objection that defendant was not represented by counsel in the lower Court cannot be maintained in this Court when the record discloses that counsel for defendant was present and took exceptions to evidence and the Court's rulings thereon. (*Post, p. 572.*)

7. EVIDENCE. *Of deceased's conduct on other occasions inadmissible.*

On a trial for murder for the killing of an officer from ambush, it is not competent to prove that the officer was in the habit of mistreating prisoners, or that in making arrests for misdemeanors he would draw a pistol on prisoners or thrust it into their faces, or that he would handcuff them. (*Post, p. 572.*)

8. SUPREME COURT. *Discrepancies in record.*

Where, on the argument of a murder case, discrepancies in the names of the jurors in the several record entries were pointed out by defendant's counsel, the Court permitted suggestion of diminution by the State, and the filing of a true record showing that the apparent contradictions were mere clerical errors. (*Post, p. 572.*)

---

FROM HAMILTON.

---

Appeal from Circuit Court of Hamilton County. JOHN A. MOON, J.

JAMES MAYNARD and D. R. NELSON for Lemons.

Attorney-general PICKLE for State.

MCALISTER, J. The plaintiff in error was convicted in the Circuit Court of Hamilton County of the murder of one Eugene Lynch, and condemned to be executed. The prisoner has appealed.

13 P—36

The deceased was a Constable of Hamilton County, and had arrested the prisoner, together with one Massy Skyles, the woman in the case, and had taken them to his residence for custody during the night, preparatory to removing them to the county jail the next morning. Early in the night the prisoner was permitted, in charge of an attendant, to step outside the house, where, eluding the vigilance of the guard, he escaped in the darkness. Next morning about six o'clock the Constable started to Chattanooga in charge of the woman, Massy Skyles, for the purpose of lodging her in jail. The officer and his prisoner were walking, and, at the moment they reached the south end of the Cincinnati Southern Railroad bridge, the deceased was mortally wounded by a shot delivered from an ambuscade on the side of the road. The wounded man was conveyed to the residence of a neighbor, where he died, after lingering three days. The dying declarations of the deceased were to the effect that John Lemons, the prisoner at the bar, had shot him from the bushes down by the Cincinnati Southern bridge. Just before he died, says the witness, Goodson, "He turned over and handed me his hand, and said that he was going to take a long sleep, and said for me to tell that John Lemons shot him from ambush."

The defendant was examined as a witness in his own behalf, and denied that he committed the deed, or that he was in the immediate vicinity at the time, but does not undertake to support his defense

of an *alibi* by any very positive or satisfactory testimony. On the other hand, the incriminating facts and circumstances pointing to the defendant as the perpetrator of this crime, are cogent and convincing. In the first place, it is shown by several witnesses, that for some reason not fully disclosed in the record, the deceased had incurred the animosity of the prisoner, and that the latter had threatened, if the deceased attempted to arrest him, he would kill him. These threats, it appears, were made at intervals ranging from two months until within a very short time of the killing, but were not regarded seriously by the witnesses, who described the defendant as a joking, blowing sort of a fellow. It appears, however, that on the night of his arrest, after escaping from the custody of the guards, the defendant went to several of his neighbors for the purpose of borrowing a shotgun, and finally procured one from Henry Barnes, upon the pretext that he had seen a drove of wild turkeys and desired to hunt them. The defendant was next seen about five o'clock that morning at a neighborhood store, where he purchased a small quantity of buckshot, calling for the largest in the stock. He is next seen on the premises of one John Howser, where his cousin, Malinda Lemons, resided, and in her presence he discharged the gun and loaded it again, saying he was going to the iron bridge; that Lynch (the deceased) should not take Massy Skyles to jail, and that if he did not turn Massy loose he was going to kill him. About

six o'clock he leaves the Howser premises, gun in hand, going in direction of the iron bridge, and on the way is recognized by an acquaintance, to whom the defendant remarked : "Good-by old boy; don't give me away," or "don't give it away." Another witness testified that he saw defendant standing in the edge of the bushes below the Cincinnati Southern bridge, with a gun, about twenty minutes before Lynch was shot. A witness for the State testified that he was eighty steps from where Lynch was shot, that he heard the report of the gun, saw the smoke, and heard a voice in the woods say: "I told you yesterday, damn you, I would get you!" and said to the woman, "Come away from there! He can't hurt you. I have done him." This statement is corroborated by another witness, who heard the report of the gun, and also a voice which he thought was that of John Lemons, telling the girl to run, and with an oath, assuring her "He can't do nothing."

The shooting occurred at six o'clock and twenty-five minutes, as indicated by the watch of deceased, which was stopped at that hour and minute by one of the buckshot fired from the gun. At this point an attempt is made to show that defendant could not have committed the deed, for the reason that a credible witness, Esquire Card, testifies that he saw and talked with the defendant, three-quarters of a mile from the scene of the killing, at four minutes past six o'clock, and that witness heard of the kill-

ing at six o'clock and twenty-five or thirty minutes, from a person who walked from the scene, a distance of · three-quarters of a mile. The witness, Esquire Card, further stated that when he saw defendant he had a gun on his shoulder; that he left witness and went to the narrow gauge railroad and turned and went down it towards his home. The witness says further, however, that when he last ˙ saw John going on down the narrow gauge, he had not got to the road leading to the baseball grounds. The baseball grounds, it seems, are between the narrow gauge railroad and the Cincinnati Southern bridge, where the killing occurred. Another witness testifies that he saw defendant about six o'clock that morning—"He left me and went toward the Cincinnati Southern bridge; he had a gun with him, and turned to the baseball ground." So, it is evident defendant was then on his way to the scene of the tragedy, and the variation in time is wholly immaterial, since it may be due to misrecollection or want of exact knowledge of the time on the part of the witness, or, it is possible that the watch of the deceased may have been incorrect in recording the time of the shooting, or it may have stopped before the shooting. It is more probable that the witness is mistaken in his recollection or knowledge of the exact time he saw defendant, than that the whole body of the State's proof, including the declarations of the prisoner himself, should be untrue. Furthermore, it is a well-settled rule, that proof of

an *alibi* should cover the whole of the time of the transaction in question, for, if it be possible that the prisoner could have been at both places, the proof of the *alibi* is valueless. Rice on Evidence, Vol. III. This Court, in speaking of this defense, says it is liable to abuse, not only when a design exists to practice a fraud on the State, but even when that design does not exist, by ignorant mistakes as to the particular hour and lapse of time; that it requires great strictness and attention on the part of the Court and jury to avoid being frequently misled by it. *Thompson* v. *State*, 5 Hum. It is very clear to our minds, upon this proof, that the defendant was in both places.

It is shown in this record that, after the deed was committed, defendant applied to one Thomas Reno, a kinsman by marriage, to set him across Soddy Creek, telling him he had killed Eugene Lynch on the end of the bridge. He asked the witness to go and get his clothes, saying he was going to Arkansas. Later, he was seen in a little boat with the woman, Massy Skyles, and his gun, about four miles from the Cincinnati Southern bridge.

The proof shows he continued his flight, in company with the woman, into the State of Georgia, traveling under an assumed name, and representing the woman as his wife. He was finally apprehended and arrested in Bradley County, Tennessee, having in his possession the double-barreled shotgun borrowed by him of Barnes, and with which the crime was

committed.    In one of the barrels was found No.
4 buckshot, corresponding in size and number with
buckshot purchased from Spence and with that cut
from the body of Lynch after the shooting.    When
arrested, defendant made inquiry in respect of the
condition of Lynch, and asked how many shot struck
him, stating to one witness that he did not intend
to kill him, but simply wished to scare him.    Six
or seven witnesses testify that defendant admitted to
them he did the killing.

As opposed to this mass of incriminating evidence,
we have the denial of the prisoner, and his avowal
that he was not at the iron bridge that morning.
He denied that he told Malinda Lemons, his cousin,
at John Howser's that morning, that he was going
to kill Eugene Lynch.    He denies that he saw Elijah
Eustice, or that he said to him, "Don't give me
away," or "Don't give it away."    He states he
first heard of the shooting through Massy Skyles,
up in the hollow above home.    He denies that he
told William Sneed, Thomas Reno, E. B. Reno, Mary
Clift, Fred Minister, James Clift, or anyone else,
that he had shot Lynch at the bridge and killed
him.    He also denies that he told James Gaines,
Mary Lassly, Bob Boon, Malinda Lemons, James
Craighead, or anyone else, that he was going to kill
Lynch.

So that, practically, the question presented was
whether the defendant, with his life depending upon
the result, should be believed, or witnesses presented

by the State, who, so far as we can see from the record, were entirely disinterested. Defendant introduced as a witness in his behalf the woman, Massy Skyles, who gives a most incredible account of the shooting. She said: "Just as we got on the far end of the bridge, Lynch pulled out his pistol and fired at some one in the woods, and then told me to run. I saw the legs of three men in the woods. After I had got to the other end of the bridge, Mr. Lynch shot again; then some one shot from in the woods and Mr. Lynch fell and hollered. I run off down the creek and got lost, and went to Mrs. McLaughlin's and asked her the way. I did not tell her that John Lemons had shot Mr. Lynch; I told her that some one had shot him, but I didn't know who. I got back in the road then, and went to Mr. Lemons, John's father. I then went up the hollow with John's sister to where John was. I then told how I got away. I told him that somebody had shot Mr. Lynch up at the bridge. He (Lemons) said he did not do it. We then started to my kinfolks in Georgia."

Mrs. McLaughlin was introduced by the State in rebuttal, and testified that on the morning that Lynch was shot Massy Skyles came to her house and asked her for a drink of water, and inquired for the way. "She told me John Lemons had shot Eugene Lynch down at the bridge."

The Deputy Sheriff who arrested John Lemons in Bradley County, states that when he went into the

negro cabin where these parties had taken refuge, he told defendant to consider himself under arrest, whereupon Massy Skyles jumped up and "made at me."

But it is unnecessary to pursue this investigation further.   We find in this record all the elements of proof necessary to make out a case of murder in the first degree.   Deadly threats are shown to have been made repeatedly by the defendant against the deceased; preparation for the crime in borrowing the shotgun and purchasing the buckshot; presence of the prisoner in the immediate vicinity of the crime, lying in wait; his subsequent flight in company with the woman, and the use of an assumed name; the physical fact of correspondence between the buckshot taken from the body of Lynch and the buckshot purchased by the prisoner and with that afterwards taken from his gun; the dying declaration of the deceased in respect of the identity of the prisoner, and, lastly, the prisoner's admission that he did the shooting. All these facts and circumstances have wrought a chain of evidence against the defendant which is irrefragable, and demonstrate his guilt beyond a reasonable doubt.

It remains to notice some alleged errors specifically assigned upon the record.   First, it is insisted the officer who took charge of the jury pending the trial was not properly sworn.   It is admitted the record recites that the Constable "was sworn according to law," but the specific objection is that

it fails to recite that he was sworn according to law "to take charge of the jury." The trial below lasted three days, and the record of each day's proceeding is that "the jury were again respited until to-morrow morning" at 8 o'clock, and "were placed in the custody of J. P. Miller, a Constable and lawful officer of Hamilton County, duly sworn according to law." The record also recites each day that the jury returned into open Court in the custody of the same sworn officer. It is well settled by this Court that the recital in an order impaneling a jury in a felony case, that the officer in whose charge the jury were placed was sworn "as required by law," or "according to law," is sufficient, without setting out the language of the oath administered. *Lancaster v. State*, 91 Tenn., 267. The record in this case recites that the Constable was duly sworn according to law, but the objection is that he was not sworn according to law "to take charge of the jury." But the recital in the record that the jury was placed in the custody of the Constable, and that he was duly sworn according to law, is sufficient.

Second. Error is also assigned upon the admission of certain alleged dying declarations of the deceased. The witness, Henry Goodson, testified that "Just before Lynch died he turned over, handed me his hand, and said that he was going to take a long sleep, and said for me to tell that John Lemons shot him from ambush and had caused his poor little children and wife to suffer." This evidence was objected to,

upon the ground that the witness did not show that deceased believed he was going to die. Another witness, Dr. Robbins, had testified that he was called to see Lynch, after he was shot, and that deceased expressed the belief that he would live. But afterwards the physician told him he could not live, and deceased then said he thought he was going to die. He further said that John Lemons had shot him (deceased) from the bushes down by the Cincinnati Southern bridge. There was no objection to this evidence, and no legitimate grounds for any exception that we can perceive. So that when, just before he died, deceased turned over and said to Henry Goodson that he was going to take a long sleep, he clearly referred. to his impending dissolution, and his declaration that John Lemons had shot him from ambush was admissible. *Curtis* v. *State*, 14 Lea, 502. It is also objected that there is no expert testimony in the record to show that the death of Lynch was the result of the wounds received. It is not suggested in the record that deceased was affected with any other malady, or that his death could have been produced by any other cause.

Morphine was administered to alleviate the pain, but there is no evidence that it was administered improperly or in excessive quantities, or any suggestion that the morphine caused his death. The proof is that deceased was struck by four buckshot, which entered his body. The physician testified that deceased was shot in a very bad vital place, and

expressed the belief that he would die. He died in three days after receiving these wounds, and there is no rational ground for a doubt that the death was caused by the wounds so inflicted.

It is next objected that the record fails to show that the prisoner was represented by counsel on his trial in the Court below. But this objection is answered in the next exception, which assigns as error the action of the trial Judge in excluding certain evidence offered on behalf of defendant to show the character of Lynch as an officer. This evidence was objected to by the State. The record recites that Colonel Clift, counsel for defendant, then stated to the Court that he proposed to prove by witness that the deceased was in the habit of mistreating prisoners; that when he arrested persons for a misdemeanor that he would draw his pistol on them, put it in their face, and that he would hand-cuff; that he treated two of the Millard boys that way. The Court properly excluded this evidence, as it did not tend in any way to elucidate the issue.

Counsel in argument pointed out certain discrepancies in the original record, in the several entries reciting the names of the jurors who tried the case, but, upon a suggestion of diminution, a more perfect transcript has been filed, in which it is shown that these apparent contradictions were merely clerical errors, and there is no basis left for any of these assignments of error.

Learned counsel were appointed by the Court,

who have conducted the defense of the prisoner in this Court with a zeal, industry, and ability worthy of the highest commendation, but, notwithstanding their efforts, the Court has been unable to find any reversible error in this record.

The judgment is therefore affirmed.