## PEOPLE *v.* JACKZO.

1. CRIMINAL LAW—HOMICIDE—CONTINUANCE—DISCRETION OF COURT.
   In a prosecution for homicide, the denying a motion for a continuance, *held*, not to amount to abuse of discretion.

2. SAME—CORPUS DELICTI—ORDER OF PROOF—RULE.
   Testimony by the first witness as to a statement of the defendant that an Indian had killed deceased, and also as to witness' examination of the body and its condition, showing acts of violence, *held*, to comply with the rule requiring the showing of the *corpus delicti* in a homicide case before the admission of other testimony; it not being necessary to show the finding of the dead body and its condition by medical testimony.

3. SAME.
   Although, in a prosecution for homicide, the death and its character should first be shown, there are exceptions where the same set of facts, in cases of circumstantial evidence, tend to connect the defendant with the commission of the crime, and also at the same time to prove the *corpus delicti.*[1]

---

[1] On the question of proof of corpus delicti in homicide, see note in 68 L. R. A. 33.

4. SAME—ADMISSIONS—EVIDENCE—ADMISSIBILITY.

A voluntary statement by defendant that "I took a stick to hit Liberty (deceased) with, and he says, 'Don't hit me,' and I threw the stick in the brush," held, admissible.

5. SAME—TRIAL—INSTRUCTIONS—REQUESTS.

An instruction by the court as to the weight to be given to statements or admissions of accused, held, not erroneous, in the absence of request for fuller instructions upon the subject.

6. SAME—DANGEROUS WEAPON—QUESTION FOR JURY.

The question as to whether a maple stick 7 feet 1¾ inches long, with a hook 1 foot and 10 inches long, and being about 6 inches in circumference at the hook end, was a dangerous weapon, or one that was likely to kill or maim, was properly submitted to the jury as a question of fact.

7. SAME—VENUE—PROOF.

Where there was no testimony showing or intimating in what township, county, or State, the crime was committed, held, that the people utterly failed to prove the venue.

8. SAME—ASSIGNMENTS OF ERROR—QUESTIONS REVIEWABLE—JURISDICTION.

Where the certificate of the trial judge to the bill of exceptions shows that it was accompanied by the assignments of error, and the court certifies that all the testimony introduced in the case that is necessary to present the questions of law raised by the bill of exceptions and assignments of error is there embraced, an assignment that the people failed to prove the venue raised the question of the jurisdiction of the court.

9. SAME—VENUE—CIRCUIT COURTS—JURISDICTION.

The jurisdiction of the circuit court of a county is restricted to the trial of persons charged with the commission of offenses in that county, except in case of change of venue.

10. SAME—UNINCORPORATED VILLAGE—JUDICIAL NOTICE.

The court will not take judicial notice of the existence of an unincorporated hamlet or settlement.

11. SAME—HOMICIDE—VENUE—PROOF.

A conviction and sentence for homicide cannot be sustained where the venue was not proved by competent evidence beyond a reasonable doubt.

Error to Baraga; O'Brien, J. Submitted April 18, 1919. (Docket No. 118.) Decided May 29, 1919.

Jess Jackzo was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Marquette. Reversed.

*Joseph J. O'Connor* (*B. H. T. Burritt,* of counsel), for appellant.

*Alex. J. Groesbeck,* Attorney General, *Leland W. Carr,* Assistant Attorney General, and *Hubert A. Brennan,* Prosecuting Attorney, for the people.

STONE, J. The defendant was charged in the information with having, on December 25, 1917, killed and murdered one William Liberty, at the township of Spurr, in the county of Baraga, and State of Michigan. Upon the trial, commenced on January 15, 1918, he was convicted of the crime of murder in the first degree. He was sentenced and is now serving a life sentence in the Marquette prison. He has sued out a writ of error and seeks to obtain a new trial because, of certain alleged errors upon the trial.

The defendant and the deceased, the former a teamster, were both employed in a logging camp located about one mile and a half south of Three Lakes, which camp was operated by the Piqua Handle Company. In this camp there were employed upwards of 30 men. A number of the men in the camp, including the defendant and the deceased, went to Michigamme on the afternoon of December 24, 1917, where they indulged in drinking intoxicating liquors, and where they remained at a hotel all night, returning to Three Lakes on Christmas morning. They were met at or near the station at this little hamlet by one George Mathews, who was the foreman of the camp. The men started to walk to the logging camp, the deceased and the de-

fendant being in the rear, and it is undisputed that the deceased and the defendant stopped at or near a bridge over a stream some little distance from the logging camp. The others of the party preceded these two men into the camp. The last seen of Liberty, the deceased, alive, was when in the company of the defendant. About an hour later the defendant came into the logging camp. He was asked by the foreman where Liberty was, and at first did not respond, but upon being asked a second time replied, "An Indian hit me, and killed Liberty." But little attention was paid to this at first, but a short time thereafter another man came into camp and reported that he had found the body of a man, with his face covered with blood, lying partly in the road close to the bridge.

The foreman and other men at once went to the place described and there found the dead body of Liberty. The place was examined for tracks in the snow, and there seemed to be no tracks leading away from the road,—all leading towards the camp. The defendant was searched but nothing was found upon his person but a knife; and very soon thereafter the foreman telephoned the sheriff, who came out to the place during the afternoon. When the body of Liberty was found there was also discovered what was termed a "water stick," which the evidence showed had been cut and prepared by the defendant, and used in the drawing of water with a pail out of the brook in the watering of teams. This was a maple stick, and was found lying about 12 feet from where the dead body was discovered; and it is undisputed in the testimony as being 7 feet, 1¾ inches long, with a hook one foot and 10 inches long, and being some 6 inches in circumference at the hook end. There were blood and snow upon this stick.

The foreman of the camp took the defendant out to the barn to talk with him and to find out whether he

knew anything about Liberty's death. The foreman also asked two or three other persons to go into the barn and secrete themselves, where they could hear the conversation. The foreman and the defendant first talked about the horses, which the defendant had the care of, and the foreman then directed his attention to the matter of the dead man, and it was in testimony that the defendant finally said: "I took a stick to hit Liberty with, and he says, 'Don't hit me,' and I threw the stick in the brush."

There was testimony tending to show that there had been a good deal of heavy drinking of intoxicating liquors in the camp shortly before the men went to Michigamme, and that when they returned they appeared to have been drinking. There was also evidence tending to show that the defendant and the deceased had quarreled, and had not been on friendly terms prior to their going to Michigamme, and that some threats of injury to Liberty had been made by the defendant.

The information was filed at the opening of the January term, on January 7, 1918, and a motion for the continuance of the case over the term was made, supported by the affidavits of the defendant, his uncle, and his counsel. These affidavits did not disclose the names of any witnesses but asked for time in which to prepare for the trial, and to examine the premises and persons at and about the camp. In the affidavit of defendant's counsel it was stated that defendant was charged with committing the crime of murder in a place called Three Lakes, which "is twenty or more miles from L'Anse," the purpose evidently being to show that some time would be necessary to go to the place to make the necessary examination. This motion for a continuance was denied, but the defendant was granted one week's time to prepare for trial. This motion for a continuance was renewed on Janu-

ary 15th, the day the trial began, and was again denied.

Upon the opening of the testimony, when the first witness was upon the stand, defendant's counsel objected to any testimony leading up to the death of Liberty until the *corpus delicti* had been proven, it appearing that the physician who had examined the body was absent. The court overruled the objection and the testimony proceeded. It appears, however, very early in the testimony of the first witness, being the foreman, that he testified to the statement made by the defendant when he came into camp, that an Indian had killed Liberty; and that testimony is immediately followed by the testimony relating to the report which came into camp and of the finding of the dead body of Liberty on the road, the witness testifying as follows:

"I went back to where Liberty was, and found him lying beside the road; his head and forehead looked as if it was caved in and his face caved in. He was lying on his back. I examined the premises around there. I went to the phone and called the sheriff, came back and found the track of a pair of overshoes by the body, traced it to the bridge where they had cut a hole in the water,"

—describing the conditions at and about the body and the finding of the pole, and the making of certain measurements of shoe tracks, and comparing them with overshoes worn by defendant.

Objection was also made to the testimony of the foreman and other witnesses with reference to the statement made by the defendant in the barn, and a somewhat similar statement made to the sheriff after the arrest.

In the course of a very lengthy and full charge, the court in charging the jury used the following language:

"I charge you that the wilful beating, wounding and ill-treating of one in a manner dangerous to life, with a weapon, without justification or excuse, under circumstances that do not reduce the homicide to manslaughter, is evidence of malice aforethought, so as to constitute the killing murder."

Also the following:

"I charge you, if you find from the evidence beyond a reasonable doubt, that the respondent Jess Jackzo, beat, bruised, wounded and ill-treated the deceased, William Liberty, with the weapon in question, without justification or excuse, and without such provocation or circumstance as would suffice to reduce the offense to manslaughter, and without such deliberation and premeditation as would be characteristic of murder in the first degree, then your verdict should be murder in the second degree."

The case was submitted to this court upon briefs, and defendant's counsel state that the errors relied upon and the questions involved are the following:

(1) The denial of defendant's motion for a continuance.

(2) Overruling defendant's objection to any testimony leading up to the death of Liberty, until the *corpus delicti* was proved.

(3) Overruling defendant's objection to the testimony of Mathews and others as to the purported confession by defendant.

(4) That the court erred in instructing the jury as above stated.

(5) That there was not sufficient evidence to support the verdict.

(6) That the people utterly failed to prove the venue.

(7) That the court did not have jurisdiction to enter judgment on the verdict of the jury.

1. We have examined the motion for a continuance and the affidavits upon which the same is founded, together with the authorities cited by defendant's counsel, and are of the opinion that there was no reversible

error in the denial of the motion for a continuance. The matter rested in the sound discretion of the trial judge, and we do not find there was any abuse of such discretion. *People* v. *Boyd,* 151 Mich. 577.

2. Did the court err in its ruling with reference to the necessity of first proving the *corpus delicti?* We recognize the rule that the death and its character should first be shown, as stated in *People* v. *Hall,* 48 Mich. 485 (42 Am. Rep. 477). See, also, *People* v. *Swetland,* 77 Mich. 53, *People* v. *Ranney,* 153 Mich. 293 (19 L. R. A. [N. S.] 443), and *People* v. *Kimbrough,* 193 Mich. 330. We have called attention to the early testimony in the case relative to the statement of the defendant that an Indian had killed Liberty, and also the testimony of Mathews referring to the examination of the body and its condition. We think that this rule requiring the showing of the *corpus delicti* in a homicide case, before the admission of other testimony, is a wise one that should be observed in the trial of such cases. We do not understand that it is necessary, however, to show the finding of the dead body, and its condition, by medical testimony; and we think that the rule laid down heretofore by us was substantially complied with in this case in the evidence of the finding of the dead body, and the appearance of the head and face of the deceased, showing acts of violence. There was later ample medical testimony. We think, however, that trial courts cannot be too particular in following the wholesome general rule that in such cases it is necessary to prove the *corpus delicti* first. That there are exceptions where the same set of facts, in cases of circumstantial evidence, tend to connect the defendant with the commission of the crime, and also at the same time to prove the *corpus delicti* has been held, and the rule has been somewhat relaxed in such cases.

3. We do not think the court erred in overruling defendant's objection to the testimony of Mathews and

others as to the statement of the defendant. It appears to have been a voluntary statement and admissible. The rule is well stated in the recent case of *People* v. *Prestidge*, 182 Mich. 80. We have examined the testimony carefully, and are of the opinion that this question was properly submitted to the jury. In that portion of the court's charge referring to this subject it used the following language:

"But in passing upon the weight to be given to statements or admissions of that kind, you should exercise a reasonable caution, taking into consideration the fact that sometimes statements or conversations are not correctly reported or may be misapprehended, or that the circumstances and conditions surrounding a person at the time he makes a statement may be such as to weaken the effect that ought to be given to his statement. But, however, you have heard the evidence in regard to the statements. You have a right to consider them in connection with all the other facts and circumstances in the case, and give them such weight as in your judgment they are fairly entitled to."

We think the case is readily distinguished from *People* v. *McClintic*, 193 Mich. 589 (L. R. A. 1917C, 52), and *People* v. *Brockett*, 195 Mich. 169. Had counsel desired fuller instruction upon this subject they should have requested the same. We find no error in this branch of the case.

4. Counsel have discussed the fourth and fifth questions relating to the charge together, and we will so consider them. As we have already said, the charge is a very lengthy and full one. It defined the crimes of murder and manslaughter, and pointed out the distinction between murder of the first and second degrees, in language which substantially has been used by this court. *People* v. *Potter*, 5 Mich. 1, 8 (71 Am. Dec. 763) ; *People* v. *Wolf*, 95 Mich. 625.

There was evidence tending to show that the homi-

cide was committed with a lethal weapon, in an unequivocal manner. It cannot be said, as matter of law, that the weapon claimed to have been used in this case was not a dangerous weapon, or one that was not likely to kill or maim. That matter was in fact submitted to the jury by the trial judge; and, as this court said in *Wellar* v. *People*, 30 Mich. 16, it was a question for the jury; and it has been held that the question whether a particular weapon is a deadly or dangerous one is one of fact for the jury. We find no error in this branch of the case.

5. The sixth and seventh questions are discussed by counsel together, and raise, in our opinion, the only meritorious question in the case. No testimony was offered on the part of the defendant. The people utterly failed to prove the venue. An examination of the record shows conclusively that there was not one word of testimony showing, or intimating in what township, county, or State even, the crime was committed. The name "Three Lakes" is mentioned by several witnesses, but there was no testimony to show whether the name of Three Lakes was the name of a village, incorporated or unincorporated, or in what county it was located. It is urged by the people in their brief that it can be gathered inferentially that the crime was committed in Baraga county. We have carefully examined the record and are unable to find any facts that would warrant the jury in so finding. Reference is made to the affidavit of defendant's counsel in which he states that Three Lakes is 20 or more miles from L'Anse. If we could consider that affidavit, it should be borne in mind that "20 or more miles from L'Anse" is a very indefinite statement. Twenty or more miles from L'Anse would take one into Marquette county. The certificate of the trial judge to the bill of exceptions shows that it was accompanied by the assignments of error. The 12th as-

signment of error is that the people failed to prove
the venue, and the court certifies that all the testimony
introduced in the case that is necessary to present
the questions of law raised by this bill of exceptions
and assignments of error is there embraced.

We are constrained to hold that the instant case is
controlled by the cases of *People* v. *Ayers*, 182 Mich.
246, and *People* v. *Warner*, 201 Mich. 547, 555. The
question is distinctly raised by the assignment of er-
ror. As we said in the last case cited, so we say here,
an examination of this record discloses that it is en-
tirely barren of any evidence that the crime had been
committed in Baraga county, the county where the
trial was had. As we pointed out in that case, so we
say here, that the question is one affecting the juris-
diction of the court in order that the trial may be a
bar to a further prosecution in another jurisdiction.
The jurisdiction of the trial court is restricted to the
trial of persons charged with the commission of of-
fenses in that county, except in case of change of
venue. We think it is our duty to follow the rule laid
down in the last cited case. Neither Michigamme nor
Three Lakes is an incorporated village, nor is either
of them the name of any township or any other sort
of municipality in that county. We cannot take judi-
cial notice of the existence of Three Lakes. No one
knows where as a hamlet the settlement of Three
Lakes begins or ends. Under these authorities, and
because the question raised is jurisdictional, we feel
constrained to set aside the conviction and sentence.

The case is therefore reversed and a new trial grant-
ed, and the defendant will be remanded to the sheriff
of Baraga county to be dealt with as the law directs.

BIRD, C. J., and OSTRANDER, MOORE, STEERE, BROOKE,
FELLOWS, and KUHN, JJ., concurred.