## STATE v. DALLAS COLE.

(Filed 24 May, 1967.)

**1. Criminal Law § 35—**

Where a medical expert testifies from his examination of the body of the deceased as to the stab wound in the side of the body, it is competent for the expert to testify that such stab wound could have produced death.

**2. Homicide § 20—**

The State's evidence tended to show that deceased was stabbed in the stomach and a piece of his liver cut out, that the wound necessitated an emergency operation, that deceased went into a coma Monday night following the stabbing on Sunday, and that deceased remained in a coma with the exception of one day until his death some seven weeks thereafter. *Held:* A person of average intelligence would know of his own experience or knowledge that such a wound is mortal and it was not required that the State show by expert testimony that the wound caused death in order to convict defendant of manslaughter.

**3. Criminal Law § 159—**

Exceptions not brought forward in the brief are deemed abandoned.

**4. Homicide § 22—**

In a homicide prosecution resulting in defendant's conviction of voluntary manslaughter, the fact that the court in its instruction correctly defined both voluntary and involuntary manslaughter will not be held for prejudicial error, even though the definition of involuntary manslaughter may not have been required.

**5. Same—Evidence held to establish conclusively that death resulted from wound inflicted by defendant.**

The State's evidence tended to show that defendant stabbed deceased and inflicted a wound which, as a matter of common knowledge, was mortal in character, that deceased went into a dying coma the day following the injury and never regained consciousness after the second day until he died, some seven weeks thereafter, together with expert testimony that the wound could have caused death. *Held:* In the absence of a request for special instructions, the court was not required to charge that, in order to convict defendant it was necessary for the jury to find beyond a reasonable doubt that the injury inflicted by defendant was the proximate cause of the death of deceased, there being no evidence tending to prove that deceased's death was due to any other cause.

APPEAL by defendant from *Falls, J.,* at 8 August, 1966, Schedule "C" Session of the MECKLENBURG Superior Court.

The deceased Homer Anderson and the defendant Dallas Cole, with their families, lived in the same rooming house in Charlotte. On Friday night, 29 April, 1966, both men were drinking and began fighting. Cole was cut by Anderson but was able to go to his job the next day. The police investigated the fight, but apparently made no charges.

STATE *v.* COLE.

Homer Anderson had a pistol in pawn on Friday but after the trouble with Cole he got it and had it the following day. When the two men returned home after work on Saturday, the trouble was resumed. Anderson had a hammer and a bottle, and during the altercation cut Cole and then ran him to his room. Cole was taken to a hospital where he remained for several hours in receiving treatment.

Following this, the defendant told B. W. Gaddy, a member of the Charlotte police department, that he was not going to prefer charges against Anderson but was going to handle it in his own way. He said he was going to kill the ————.

The State's evidence further tended to show that on Sunday Dallas Cole and the deceased (nicknamed Dub) were scuffling and Dub was trying to get away from Cole. Dallas pushed Anderson back by sticking a knife in his stomach. He had taken this knife from his back pocket, and he also had a butcher knife. Anderson had no weapon at that time.

Later on, Cole was seen chasing Dub toward the railroad tracks. He had two knives and a hammer. They went out of sight of the people at the house, and shortly afterwards Cole returned and told Anderson's wife "If you want to save that so and so, you better get down. He is on his way to the hospital or the undertaker's." He then added, "If that s. o. b. ain't dead, he will be dead." The defendant's knife and hammer had blood on them at that time. When Mrs. Anderson arrived at the place where her husband was she found him bleeding from his right side. He was stabbed in the stomach and a piece plugged out of his liver. He was taken to the hospital by ambulance, lapsed into a coma a day or so later and died while still in the coma on 27 June.

The State offered evidence tending to show that the wound on the body of Anderson could have caused his death.

The defendant testified in his own behalf that he had known Anderson for three or four years, and that they had worked together. He said the deceased had been accusing him of telling people on the job about his drinking habits, and this led to a fight on Friday night, following which the deceased said he was going to get his pistol from the pawn shop and was going to kill him (Cole) when he came back. Sometime later the deceased pointed his pistol at the defendant and told him he was going to kill him, and struck him on the head with the pistol. Still later that night he said the deceased came back and wanted to fight again and cut him up; that he cut him up and busted his lip.

Cole further testified that on Saturday afternoon the deceased cut him a total of four times, stabbed him in the jaw and in the neck; and that he was then taken to Memorial Hospital for treat-

ment. He was released after several hours and returned to his home. On Sunday morning he said that the deceased sat on the steps in the hall and said he was going to raise hell some more; that he was going back to jail "today"; that he cursed and threatened Doretha Cole, the defendant's daughter, and that he, the defendant, then left to avoid further trouble; that, later, Homer Anderson came back up the railroad and jumped at him again with his knife; that the defendant was hemmed up against a fence; that they scuffled; that Homer had a knife and was stabbed in the scuffle. "I don't know exactly how he got stabbed, all I know is I was trying to keep him from killing me . . . he cut me in the hand. I fell one time and he cut my shoe. He (the deceased) used to beat me up all the time; not only me, her too; she had to sleep with us many nights when he would go on a rampage; she couldn't rest over there, shooting and going on." (It is assumed that "she" referred to the deceased's wife).

The defendant said he knew the deceased was cut in the stomach because he could see the blood, and that he told someone to call a doctor.

The defendant was convicted of manslaughter, and from judgment of imprisonment appealed to this Court.

*Nivens & Brown by W. B. Nivens Attorneys for defendant appellant.*

*T. W. Bruton, Attorney General, and Wilson B. Partin, Jr., Staff Attorney, for the State.*

PLESS, J. The defendant assigns a number of errors, one group of which is to testimony regarding the cause of death, the remainder constituting exceptions to the charge. Dr. W. M. Summerville, County Coroner, and an admitted medical expert, testified: "I performed a complete autopsy on the deceased to determine the cause of his death. I cut into the chest and then into the abdomen and removed all organs — for examination . . . there was a long incision extending from the end of the breast bone almost to the pelvis. There was a stab wound or surgical wound . . . There was a stab wound in the right-hand side." At this point, the jury retired, and the doctor was further examined. Upon its return, he was asked: "Do you have an opinion satisfactory to yourself, if the jury should find by the evidence and beyond a reasonable doubt, that Homer Anderson was stabbed in the right side, as to whether or not this was likely to have produced his death? Answer: I do. Question: What is your opinion? Answer: It could have produced his death."

The defendant objected to both questions and answers, and took exception thereto.

While the form of the first question and the answer to the last one is not in preferred form, we have previously held that a statement by a witness that a particular result *could* have occurred upon the hypothetical facts is competent.

In *Schafer v. R. R.*, 266 N.C. 285, 145 S.E. 2d 887, Lake, J., speaking for the Court, said:

> "When an expert is testifying as to his opinion, concerning the cause of an event which he did not observe, the proper form of question is one which states, hypothetically, premises as to which there is evidence already in the record. The question should then call for the opinion of the expert as to whether the facts so supposed could have caused the condition in question, rather than calling for the witness' conclusion as to what actually did cause it. *Service Co. v. Sales Co., supra* (259 N.C. 400, 131 S.E. 2d 9); *Patrick v. Treadwell, supra* (222 N.C. 1, 21 S.E. 2d 818); *Summerlin v. R. R.*, 133 N.C. 550, 45 S.E. 898; Stansbury, North Carolina Evidence, § 137."

In *State v. Minton*, 234 N.C. 716, 68 S.E. 2d 844, Ervin, J., speaking for the Court, said:

> "The State did not undertake to show any causal relation between the wound and the death by a medical expert. For this reason, the question arises whether the cause of death may be established in a prosecution for unlawful homicide without the use of expert medical testimony. The law is realistic when it fashions rules of evidence for use in the search for truth. The cause of death may be established in a prosecution for unlawful homicide without the use of expert medical testimony where the facts in evidence are such that every person of average intelligence would know from his own experience or knowledge that the wound was mortal in character. *Waller v. People.* 209 Ill. 284, 70 N.W. 681; *State v. Rounds,* 104 Vt. 442, 160 A. 249. See, also, in this connection: *S. v. Peterson, supra* (225 N.C. 540, 35 S.E. 2d 645); *S. v. McKinnon*, 223 N.C. 160, 25 S.E. 2d 606; *S. v. Johnson, supra* (193 N.C. 701, 138 S.E. 19); *Brundage v. State,* 70 Ga. App. 696, 29 S.E. 2d 316; *James v. State,* 67 Ga. App. 300, 20 S.E. 2d 87; *Brown v. State,* 10 Ga. App. 216, 73 S.E. 33; *Commonwealth v. Sullivan,* 285 Ky. 477, 148 S.W. 2d 343; *People v. Jackzo,* 206 Mich. 183, 172 N.W. 557; *Franklin v. State,* 180 Tenn. 41, 171 S.W. 2d 281; *Mayfield v. State,* 101 Tenn. 673, 49 S.W. 742; *Lemons v. State,* 97 Tenn.

560, 37 S.W. 552; *McMillan v. State,* 73 Tex. Cr. 343, 165 S.W. 576; *State v. Bozovich,* 145 Wash. 227, 259 P. 395."

The evidence in this case brings it within the rule of the *Minton* case. The State's evidence tended to show that when the wife of the deceased went to the railroad track and found him, that he was stabbed in the stomach with a piece of his liver plugged out, and was bleeding from his right side. He was taken to the hospital, operated on that day, and put under oxygen. "He had two operations because they had to bore a hole in his stomach and put a tube in and had to operate in the emergency room that Sunday . . . He was not able to walk — he was paralyzed. He couldn't move no kind of way. He could not raise his hands up — he was paralyzed. He couldn't even move because wherever they laid him he had to lay there . . . Homer went into a coma that Monday night. I (his wife) stayed there until 10:30, when I left Memorial Hospital that night, he was not in a coma. When I got home to go back — Tuesday they call and told me that he had done went back in a coma . . . He went into a coma that Monday night, and he did not come out of that coma."

From the above evidence, it would seem that although the deceased lived for several weeks after receiving his injuries, he was in a dying coma. During that time, and from the nature of the wounds on his body, a "person of average intelligence would know from his own experience or knowledge that the wound was mortal in character."

The defendant has some eighteen exceptions to the charge of the Court but refers to only two of them in his brief. Under our rules, the others are deemed abandoned. *State v. Strickland,* 254 N.C. 658, 119 S.E. 2d 781. However, they have been considered and are found to be without merit.

One of the exceptions noted in the brief is to that portion of the charge in which the Court defined manslaughter, both voluntary and involuntary. He complains that the Court defined involuntary manslaughter, but the instruction given was a correct one in defining both types of manslaughter, and we do not see that any substantial injustice was done to the defendant, even though the definition of involuntary manslaughter may not have been required. Another exception presented was to a further statement of the law of manslaughter in which the Court properly and fully dealt with anger and sudden passion as elements. A careful consideration of this exception discloses it was a correct and well expressed statement of the law of manslaughter.

The remaining exception discussed in the appellant's brief is

that since the death of the deceased did not occur for some seven weeks following his injuries that the Court committed error in failing to charge the jury on "proximate cause," contending that he should have instructed the jury that before the defendant could be convicted of any degree of homicide, it would have to find beyond a reasonable doubt that the injuries inflicted by the defendant were the proximate cause of the death of his antagonist. However, upon the State's evidence (1) that the defendant told Officer Mobley at the scene that he had stabbed Homer with a butcher knife; (2) the statement by the officer that the deceased was bloody in the lower right abdomen, that he found a stab wound at that time; (3) the statement by the wife of the deceased that he was bleeding from his right side where the stab was, that "he was stabbed and bloody and when they picked him up blood run out. He was stabbed in his stomach and a piece plugged out of his liver . . . The blood was coming from his right side, I looked at it, the cut place was pretty deep"; (4) other evidence relating to the two operations on the deceased; (5) the undisputed testimony that he went into a dying coma the day following the trouble, that he never regained consciousness after the second day, together with (6) Dr. Summerville's opinion — all are sufficient to fully establish the cause of death.

"Where the cause of death is disputed and there is evidence tending to prove that deceased's death was due to some cause other than the injuries inflicted by accused, the Court may and should instruct the jury fully and clearly on the issue as to the proximate cause of the death. The Court may, and should, particularly if requested, instruct the jury to the effect that they cannot convict, or in other words that they must acquit, unless they are satisfied that decedent died from the injuries inflicted by accused and not from some other cause, such as from improper medical or surgical treatment of the injuries." 41 C.J.S., Homicide, § 363.

Also, "The view has been taken, however, that where, upon the undisputed facts, it clearly and conclusively appears to a moral certainty that the unlawful act complained of was the proximate cause of death, a failure so to charge, especially where there was no request so to charge, is not reversible error. An instruction as to an independent intervening cause is not proper in the absence of evidence to sustain it." 26 Am. Jur., Homicide, § 533.

There being "no evidence tending to prove that deceased's death was due to some cause other than injuries inflicted by the accused,"

an instruction on proximate cause was unnecessary, and especially when there was no request therefor. However, the Court did in several instances require that the jury find that the defendant had killed the deceased as a prerequisite to any verdict of guilty. In one place, as part of the instruction, the Court said, "If you find . . . that he cut and stabbed and killed the deceased . . . that he killed him intentionally, that he killed him with a deadly weapon . . ." In another section of the charge the Court said, "I instruct you that you should ask yourself these questions. Did the defendant cut and stab the deceased? Second: Did he kill him intentionally? Third: Did he kill him with a deadly weapon? If you find from the evidence and beyond a reasonable doubt or if you find from the admission of the defendant that the truth requires an affirmative answer to each of these questions; that is, that each and every one of these should be answered yes, then . . ." In still another portion of the charge, the Court instructed the jury that they should ask themselves the questions just above set forth, and at the conclusion of the charge told the jury that if they found "that the defendant stabbed the deceased . . . that he killed him intentionally, that he killed him in the heat of passion . . ."

The foregoing excerpts from the charge establish that the jury was fully informed that the injuries inflicted by the defendant must have caused the death of Homer Anderson before he could be convicted of any offense. In the trial below, there was

No error.