# UNITED STATES COURT OF APPEALS
## Tenth Circuit
### Byron White United States Courthouse
### 1823 Stout Street
### Denver, Colorado 80294
### (303) 844-3157

Patrick J.  Fisher, Jr.                                                    Elisabeth A. Shumaker
Clerk                                                                      Chief Deputy Clerk

April 7, 1997

**TO:**   All recipients of the captioned opinion

**RE:**   96-8000, USA v. Swallow
          March 24, 1997

Please be advised of the following correction to the captioned decision:

On page four of the opinion, in the paragraph which begins "Although there are minor disputes...", the phrase in the second sentence which reads "approximately thirty-five miles from the camp" should read "approximately thirty-five miles from the reservation headquarters."

Please make the appropriate correction.

Very truly yours,

Patrick Fisher, Clerk

Susie Tidwell
Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

MAR 24 1997

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENHT CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STEVEN LEE SWALLOW,

Defendant-Appellant.

No. 96-8000

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 94-CR-0135-D)

Laurence P. Van Court, Assistant Federal Public Defender  (Michael G. Katz, Federal Public Defender and James H. Barrett, Assistant Federal Public Defender with him on the briefs), Cheyenne, Wyoming for Defendant-Appellant.

James C. Anderson, Assistant United States Attorney (David D. Freudenthal, U.S. Attorney for the District of Wyoming, Assistant U.S. Attorney with him on the briefs), Cheyenne, Wyoming for Plaintiff-Appellee.

Before TACHA, HENRY, and BRISCOE, Circuit Judges.

HENRY, Circuit Judge.

Appellant Steven Lee Swallow was found guilty of two counts of first-degree murder and two counts of second-degree murder under 18 U.S.C. § 1111(a), and four counts of carrying a firearm during the commission of a violent crime under 18 U.S.C. § 924(c). Mr. Swallow appeals his convictions for two counts of second-degree murder for the murders of his wife, Cleo, and his brother, Ethan. Specifically, Mr. Swallow appeals the district court's refusal to give his proposed jury instructions regarding intervening cause arguing: (1) that the unforeseeable gross negligence of a third party may relieve Mr. Swallow of responsibility, and (2) that the definition of "gross negligence" in this context includes the failure to act to avert injury to another. The district court did not erroneously refuse to issue Mr. Swallow's proposed instructions. We exercise jurisdiction under 18 U.S.C. § 1153 and 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

In November 1994, Mr. Swallow, his wife Cleo, and his two children lived on the Wind River Reservation at a location commonly known as the "ditch camp," approximately one-half mile from the settlement of Crowheart, Wyoming. Mr. Swallow's two brothers, Shawn and Ethan Swallow, resided next door.

On November 24, 1994, sometime after 10:00 p.m., Cleo, recently beaten by Mr. Swallow, retreated to Shawn's and Ethan's home. Rec. vol. VII, at 85, 202. Mr. Swallow, apparently intoxicated, entered his brothers' home shortly after Cleo arrived. After fighting with his brother Ethan, id. at 86, 204, Shawn told Mr. Swallow to go home

2

until he had calmed down.  <u>Id.</u> at 94, 206.  About five minutes later, Mr. Swallow kicked in the door to his brothers' home and entered with a gun.  <u>Id.</u> at 108.  The three brothers started arguing.  Mr. Swallow then shot his brother Shawn, and a guest, Reuben Lajeunesse, both of whom died almost immediately.  Mr. Swallow also shot his brother Ethan, and his wife.  Ethan died approximately ninety minutes later; Mr. Swallow's wife died several hours later.

Four adults and Mr. Swallow's two children were also present at the time of the shootings.  Regina Hill and Mr. Swallow's son escaped unharmed to the residence of a neighbor, Tom Presgrove, who was also in the house at the time of the shootings.  Mr. Presgrove, Douglas Willow, Verna No Ear, and Mr. Swallow's twelve-month-old daughter escaped and hid behind some other buildings nearby.  Eventually the three adults, with the infant, approached Mr. Swallow, and Mr. Willow attempted to telephone for help.  Mr. Swallow then pulled the telephone cord out of the wall.  When Mr. Willow attempted to render aid to Cleo, Mr. Swallow said, "No, just leave her there."  Rec. vol. VII, at 126.  Ms. No Ear asked if they could take Ethan, and Mr. Swallow replied, "No Verna, I don't know what I'm going to do next.  Just go."  <u>Id.</u> at 221-22.

After the survivors had left the camp, Mr. Swallow telephoned 911 at 10:38 p.m. and spoke with the 911 dispatcher at the Fremont County sheriff's office for approximately two hours and forty minutes.  Mr. Swallow told the dispatcher he "just shot up half the house."  Rec. vol. V, at 43.

During the phone call, Mr. Swallow repeatedly asked for medical personnel to render assistance, but refused to surrender as the 911 operators requested. At one point, Mr. Swallow stated he would not harm any medical personnel, but early in the conversation, he threatened to kill any law enforcement personnel who entered the house. The standard operating procedure for Fremont County emergency responders requires that law enforcement personnel secure a crime scene before entry.

Although there are minor disputes about the facts, the parties agree to the following events: The dispatch center mobilized and dispatched emergency medical personnel shortly after receiving the 911 call. A command post was established sometime after 11:00 p.m. in the Crowheart Fire Hall, approximately thirty-five miles from the reservation headquarters and fifty miles from the Fremont County sheriff's office. The first ranking law enforcement official arrived at the fire hall at approximately 11:30 p.m.

The rescue squad encountered several delays in reaching the reservation site. The remote area of the ditch camp presented communications problems between the squad and the dispatcher, which impeded organization of the rescue team. The distance from the Fremont County sheriff's office to the site also added to the response time. The squad cleared Mr. Presgrove's residence and then it stopped to interview both the witnesses to the shootings and a car-load of people seen departing from Shawn and Ethan Swallow's residence. After learning that Mr. Swallow was an excellent marksman, and because of the clear moonlit night and open grazing land surrounding the camp, the squad decided to

4

take a more circuitous route to approach the residence. The squad also waited for two other groups of officers, who approached the site from different directions.

At approximately 1:13 a.m., Mr. Swallow left his brother's house and returned to his house. Around 3:15 a.m., the authorities entered Mr. Swallow's brother's house and found all four victims dead. The authorities then proceeded to Mr. Swallow's residence, where they found him asleep. The pathologist who performed autopsies upon the bodies of Cleo and Ethan Swallow testified that both individuals bled to death as the result of gunshot wounds.

Prior to trial, the government filed a motion in limine to prohibit Mr. Swallow from "arguing to the jury that [he] should be relieved from criminal responsibility in the deaths of Cleo Swallow and Ethan Swallow as the result of the acts or omissions of law enforcement officers and/or emergency technicians." Rec. vol. I, doc 47, at 1. After Mr. Swallow filed a response, the court heard argument on the government's motion. The court ruled that it would allow Mr. Swallow to lay the foundation for a defense based on the acts and omissions of the officers and technicians. The court also stated that it would allow Mr. Swallow's attorney to "cross-examine witnesses in such a way that will allow you to assert that there is a legitimate basis for this defense." Rec. vol. III, at 28. However, the court added that it would not allow Mr. Swallow's counsel to "mention this defense, per se." Id.

During the instruction conference, the court again heard argument on the issue. The court rejected Mr. Swallow's proposed instructions, ruling they did not contain a correct statement of the law on intervening cause as applied by a majority of courts. Furthermore, the district court stated that there was insufficient evidence to justify giving the instructions. For the reasons stated herein, we affirm the district court's ruling.

## II. DISCUSSION

A defendant is entitled to an instruction on his theory of the case if the instruction is a correct statement of the law and the theory is supported by sufficient evidence for the jury to find in his favor. United States v. Grissom, 44 F.3d 1507, 1512 (10th Cir.), cert. denied, 115 S. Ct. 1720 (1995). We review de novo the instructions as a whole. United States v. Voss, 82 F.3d 1521, 1529 (10th Cir.), cert. denied, 117 S. Ct. 216 (1996). We review the district court's refusal to give a particular jury instruction requested by the defendant for an abuse of discretion. Id.

### A. Murder under the Major Crimes Act

Under the Major Crimes Act, any Indian who commits murder within Indian country is subject to the same "law and any penalties as all other persons committing" murder, within the exclusive jurisdiction of the United States. 18 U.S.C. § 1153(b); see also 18 U.S.C. § 3242 (providing that Indians prosecuted under the Major Crimes Act "shall be tried in the same courts and in the same manner as are all other persons committing such offense within the exclusive jurisdiction of the United States").

6

"Murder is the unlawful killing of a human being with malice aforethought."  18 U.S.C. § 1111(a).  First-degree murder includes any kind of "willful, deliberate, malicious, and premeditated killing."  Id.  Any other murder is second-degree murder.  Id.  Although Mr. Swallow was charged with four counts of first-degree murder, the jury found Mr. Swallow guilty of second-degree murder for the deaths of Cleo and Ethan Swallow.

### B. Instructions given by the court

Mr. Swallow first argues that the instructions as a whole incorrectly stated the applicable law.   The district court did not give the jury any instructions specifically on the issue of proximate cause or the defense of intervening cause.  Rather, the court instructed the jury that to find Mr. Swallow guilty of first-degree murder, it must find beyond a reasonable doubt that Mr. Swallow committed the "unlawful killing of a human being with malice aforethought" that was "perpetrated by any kind of willful, deliberate, malicious and premeditated design unlawfully and maliciously to effect the death of any human being . . . ."  Rec. vol. XIII, at 14.  The court defined second-degree murder as the unlawful killing of a human being with malice aforethought, "but without the premeditated intent willfully to take a human life . . . ."  Id. at 20-21.

Proximate cause of death is an essential component of both first- and second-degree murder.  See e.g., Rollin M. Perkins & Ronald N. Boyce, Criminal Law 774-821 (3d ed. 1982); State v. Bennis, 457 N.W.2d 843, 846 (S.D. 1990).  Although the trial court did not expressly instruct that the government had the burden to prove that Mr.

7

Swallow's conduct was the proximate cause of the decedents' deaths, the court did instruct that the jury that, in order to find Mr. Swallow guilty of first or second-degree murder, it had to find that Mr. Swallow "kill[ed]" the decedents. See Rec. vol. XIII, at 16, 21; see also 2 Leonard B. Sand et al., Modern Federal Jury Instructions ¶ 41.01, at 41-7 (1996) (providing definition of "kill"). The record indicates that there was undisputed expert testimony that the decedents died from blood loss that resulted from the gunshot wounds. Rec. vol. XII, at 21.

The court also gave carefully phrased pattern instructions defining the key terms of each element. See Rec. vol. XIII, at 15, 20-21, 23-24. After carefully reviewing the record and examining the jury instructions as a whole, we believe that the instructions properly informed the jury that it could only find Mr. Swallow guilty of murder on each count if it concluded that he proximately caused the victim's death.

C. Mr. Swallow's proposed instructions

Mr. Swallow further argues that the district court abused its discretion in refusing to give two proposed instructions. The first proposed instruction characterizes an independent intervening cause as the unforeseeable gross negligence of a third party that relieves the defendant of responsibility for the death of the victim. Rec. Supp. vol. I, Proposed Jury Instruction A (citing People v. Gentry, 738 P.2d 1188 (Colo. 1987); United States v. Guillette, 547 F.2d 743 (2d Cir. 1976)). The second proposed instruction defines gross negligence as "knowledge of a situation requiring the exercise of ordinary

8

care and diligence to avert injury to another, the ability to avoid the resulting harm by ordinary care and diligence . . . and the omission to use such care and diligence to avert the threat and danger when . . . it must be apparent that the result is likely to prove disastrous to another." Rec. Supp. vol. I, Proposed Jury Instruction B (citing People v. Sealey, 356 N.W.2d 614 (Mich. Ct. App. 1984)).

First, after careful examination of the record, we agree with the district court that there simply was no evidence of gross negligence by the rescue squad. As the district court stated, there was no "evidence presented by the defense on their defense that the conduct of the officers was so deficient as to raise their conduct to a level of gross negligence." Rec. vol. XII, at 18-19.

Moreover, the requested instruction provided that the defendant would be relieved of responsibility for the deaths only if he did not participate in the intervening cause. The record established that the defendant participated in the intervening cause. By refusing to surrender, he was a cause of the rescue squad's delay in reaching the victims. Mr. Swallow was not entitled to the requested instruction.

Additionally, although the district court allowed him to present evidence in support of his theory of intervening cause, Mr. Swallow presented no evidence to rebut the government expert's findings that Cleo and Ethan bled to death as a result of the gunshot wounds. An instruction as to intervening cause is not proper absent evidence to sustain it. See State v. Cole, 154 S.E.2d 506, 511 (N.C. 1967) (citing 26 Am. Jur. Homicide § 533

(1940)); see also Carlston v. United States, 671 F. Supp. 1324, 1326 (D.N.M. 1987) (holding in a civil context, "[w]hen reasonable minds cannot differ on the issue of intervening cause, the matter can be decided as one of law").  Mr. Swallow introduced no expert testimony that indicated the wounds were not dangerous or calculated to produce death.  See Baylor v. United States, 407 A.2d 664, 669 (D.C. 1979) (stating "[o]rdinarily expert medical testimony will be required to show that the wound was not dangerous or calculated to produce death").  Thus, the court correctly found that defendant's evidence failed to support a submission of any instruction regarding intervening cause to the jury.  See State v. Soucy, 653 A.2d 561, 563-64 (N.H. 1995) (stating "if some evidence is offered, . . . which is reasonably calculated to provide a reasonable doubt on the issue of causation, it must be admitted and the element of causation, with the supported defense, must be submitted to the jury").

Finally, even if we were to accept Mr. Swallow's invitation to analogize to tort law, he would not prevail, because we are here concerned with a negative act.  See Aplt.'s Br. at 14-15.  Professors Perkins and Boyce insightfully note that "[i]t has seemed important to recognize the possibility of a negative act being superseding in a civil case, but even there this applies only in very exceptional situations which seem to have no counterpart in criminal cases."  Perkins & Boyce, supra at 819-20 (presenting the following illustration:  Automobile negligently driven by A strikes B, leaving B unconscious on the highway, bleeding to death.  C, a passing motorist, stops and surveys

10

the situation, and drives on without rendering aid to B. B bleeds to death. "<u>Regardless of whether C is under any duty to B to render such aid</u>, his failure to do so is not a superseding cause which will relieve A of liability for [B's death].") (emphasis in original) (citations omitted). The Restatement of Torts similarly indicates that the mere existence of an unperformed duty does not rise to a superseding cause that can break the causal chain. <u>See</u> <u>Restatement (Second) of Torts</u> § 452, cmt. c, illus. 4 (1965). Furthermore, "[i]n cases involving death from injuries inflicted in an assault, courts have uniformly held that the person who inflicted the injury will be liable for the death despite the failure of third persons to save the victim." <u>Kusmider v. State</u>, 688 P.2d 957, 959 (Alaska Ct. App. 1984) (citing <u>Wright v. State</u>, 374 A.2d 824, 829 (Del. 1977); <u>Pettigrew v. State</u>, 554 P.2d 1186, 1193 (Okla. Ct. Crim. App. 1976); <u>People v. McGee</u>, 187 P.2d 706, 714-15 (Cal. 1947)). Thus, Mr. Swallow's analogy to tort law itself collapses.

In conclusion, the record does not support the issuance of Mr. Swallow's proposed instructions. Therefore, the district court did not err in refusing to give Mr. Swallow's proposed instructions on intervening cause and gross negligence. Mr. Swallow's convictions for second-degree murder are affirmed.

11