STATE OF NORTH CAROLINA v. HARRY HUNTER

No. 44

(Filed 1 September 1976)

1. **Constitutional Law § 32— out of state counsel not permitted — right to counsel not abridged**

   Defendant was not denied his right to counsel under the Sixth and Fourteenth Amendments to the U. S. Constitution by the trial court's refusal to allow a S. C. solicitor from the district in which defendant's beach motel was located to represent defendant in this N. C. prosecution, since defendant was represented by an able N. C. attorney and by the S. C. attorney who normally handled defendant's business affairs.

2. **Criminal Law § 91— continuance to obtain additional counsel — denial proper**

   The trial court did not err in denying defendant's motion to continue the case in order to permit him to employ additional counsel, since defendant was represented by two attorneys and there was no indication or allegation that he even wished to obtain another lawyer or that other counsel was necessary to prepare adequately the defense.

3. **Criminal Law § 169— objectionable testimony — similar testimony admitted without objection — no prejudice**

   Defendant was not prejudiced by testimony concerning his participation in a separate crime since testimony of like import was thereafter admitted without objection.

4. **Criminal Law § 34— defendant's participation in other crimes — evidence admissible**

   In a prosecution of defendant for first degree murder and armed robbery or attempted robbery where the court submitted to the jury only the issue of defendant's guilt as an accessory before the fact to murder, evidence of defendant's participation in other breakings, enterings and larcenies together with other evidence showing the relationship of the defendant with the other men involved in the crimes tended to establish a common plan or scheme embracing the commission of a series of larcenies so related to each other that proof of these other crimes tended to prove the crime charged and to connect the accused with its commission; therefore, the trial court properly admitted evidence of defendant's participation in other crimes.

5. **Criminal Law § 43— slides of murder victim's wounds — admissibility**

   The trial court did not err in allowing the jury to view slides of the wounds of a murder victim, since the slides were relevant upon the question of cause of death and the slides illustrated the testimony of a medical witness.

6. **Criminal Law § 10— accessory before the fact — proof required**

   To convict defendant of being an accessory before the fact the State must prove (1) that the defendant counseled, procured, com-

State v. Hunter

manded, encouraged, or aided another to commit the offense; (2) the defendant was not present when the crime was committed; and (3) the principal committed the crime.

7. **Homicide § 21— accessory before the fact to murder — sufficiency of evidence**

In a prosecution for accessory before the fact to murder, evidence was sufficient to be submitted to the jury where it tended to show that defendant was not present when the crime was committed, the principal committed the crime, defendant told one of the parties to the crime that the victim kept a substantial amount of money on him or in his possession which they could steal, defendant told another person that he would help set up the crime, defendant informed his companions in the crime that he planned to have the larceny occur while the victim dined at his house, defendant later informed them that they would have to catch the victim at home because defendant did not know where the money was, defendant showed his cohorts where the victim's home was, he instructed them to come back to his house after the "job," and it was understood that defendant was to get 25% of the money stolen.

8. **Criminal Law § 112— proof beyond a reasonable doubt — sufficiency of instructions**

Though two sentences of the trial court's instructions as to the elements of the crime that the State must prove in order for the jury to find defendant guilty failed to inform the jury that such proof must be shown by evidence establishing the enumerated elements beyond a reasonable doubt, such failure did not amount to a violation of G.S. 1-180, since the court's charge as a whole made it clear to the jury that each element had to be proved by evidence establishing the same beyond a reasonable doubt.

9. **Homicide § 25— accessory before the fact to murder — jury instructions proper**

In a prosecution of defendant for accessory before the fact to murder, the trial court's instructions (1) concerning the immediate causal connection between the counseling of the principal by the defendant and the commission of the crime by defendant, (2) as to whether defendant and the principal entertained the common design that the principal take money from the person or presence of deceased by violence or intimidation, and (3) summarizing the evidence were proper.

10. **Homicide § 25— felony-murder — failure to instruct on elements of underlying felony — no prejudicial error**

Although the trial court should have spelled out the essential elements of the underlying felony of attempted armed robbery in its instructions as to what the State must prove to convict defendant of being an accessory before the fact to felony-murder, his failure to do so was not prejudicial error because: (1) the occurrence of the attempted armed robbery was not disputed and thus was not in issue under the evidence of the case, (2) defendant failed to request specifically instructions on the underlying felony, (3) the court did

define "attempted armed robbery" as "attempted robbery with a firearm," and (4) these terms were essentially self-explanatory under the circumstances of this case.

Judge EXUM concurs in result.

Justice LAKE dissenting.

APPEAL by defendant pursuant to G.S. 7A-27(a) from *Rousseau, J.,* at the 18 August 1975 Criminal Session of UNION County Superior Court.

On two separate indictments, proper in form, defendant was charged (1) with first-degree murder of William Benjamin Potts and (2) with armed robbery or attempted robbery of William Benjamin Potts. The court submitted to the jury only the issue of his guilt as an accessory before the fact to murder. The jury returned a verdict of guilty, and a sentence of life imprisonment was imposed.

The evidence for the State tended to show the following: Billy Wade Devine, Gary Allen Watkins, and James Earl Locklear had pleaded guilty to second-degree murder of Potts at a previous term and received life sentences. Devine and Watkins testified for the State.

The defendant had lived at Myrtle Beach, South Carolina, during the summer months for many years. He was past 60 years in age and was married to his present wife in 1974. He owned and operated the Bay Shore Motel at Myrtle Beach, South Carolina. He had a home in Union County, North Carolina, located between Monroe, North Carolina, and Pageland, South Carolina. It was his custom to spend the winter season at his Union County home.

Gary Watkins testified that he supported himself by stealing and that he and Charles Duncan (also known as Charles Evans) had not worked at any lawful occupation for at least 3½ years. Watkins, who was with Duncan and another man at the time, met the defendant about August, 1973, at the Bay Shore Motel.

Billy Devine testified that the defendant and Charles Duncan were not friends of his. They were just people who put him onto "jobs" (larcenies). In the summer of 1974, Devine met the defendant at the Bay Shore Motel in the presence of Watkins and Duncan.

State v. Hunter

Devine and Watkins first visited the defendant with Duncan at the defendant's Union County home in the summer or winter of 1974. Prior to 7 February 1975, Devine visited the defendant about three times at his Union County home. Watkins visited the defendant there a total of three or four times.

Devine, Watkins, and Duncan visited the Bay Shore Motel six or seven times during the 1974 summer, and the defendant was there on every occasion. Devine and Watkins paid rent there only once or twice. The inference was that generally no rent was charged.

During the summer of 1974, the defendant discussed a "job" with Devine and Watkins involving the theft of a safe from the home of Tony Thompson at Myrtle Beach. The defendant told them the Thompson family had some money because they owned Dino's Restaurant. He gave Watkins the tools to open the safe. When Watkins and Devine broke into the house through the back door on 21 July 1974, they unexpectedly encountered a Greek lady, whom Watkins threw to the floor and tied up with the assistance of Devine. They hauled the safe away, but it was found to be empty when they opened it. They dumped the safe in a canal.

During the summer of 1974, the defendant, Charles Duncan, Devine, and Watkins had a conversation about breaking into the Atlas Construction Company at Myrtle Beach and stealing some diamonds and guns. The defendant explained to the others what could be obtained and where the company was located. Watkins, Devine, and Duncan broke into the establishment on 30 August 1974. No diamonds were found, but they did take thirty guns of various descriptions. These were brought back to the Bay Shore Motel, and the defendant picked out two or three guns for himself. One of these was a .25 Colt Automatic Pistol (identified in evidence as State's Exhibit 1), which was later found as a result of a valid search at the Bay Shore Motel on 14 May 1975 when the defendant reached in a drawer and handed it to officers. Another of these was a Police Special .38 Pistol (identified as State's Exhibit 2), which Devine testified Watkins had on 7 February 1975 and was found on that date under the driver's side of the front seat of the Grand Prix automobile that Watkins was operating. It was apparently understood that anyone who planned a "job" would receive a part of the proceeds. The remaining guns were disposed of by

Duncan, and the money was distributed among Duncan, Devine, and Watkins.

On the night of the Atlas Construction Company break-in or immediately afterwards, the defendant told Devine about two men, a Mr. Potts in Union County and a Mr. Cato in Pageland, South Carolina, nearby. The defendant said they kept a substantial amount of money on them or in their possession that the defendant and Devine could steal. The defendant also discussed these two men and the available money with Watkins. The defendant told him that he would help set it up for them.

Another break-in and larceny was discussed by Gary Watkins and the defendant. He suggested a house that was owned by Allison Davis and located just past Ocean Drive in North Myrtle Beach. He described the house and said that the Davis family had a lot of money because they paid cash for a Mercedez-Benz and still had a safe in the house. On 17 December 1974, Devine, Watkins, and Duncan broke into the house through a back door but found no safe and left.

About two weeks before 7 February 1975, the defendant told Watkins that he would invite Mr. Potts for supper and Watkins and the others could break in the Potts' house and take the money.

About a week before 7 February 1975, Devine, Watkins, Duncan, Locklear, and a Curt Petty drove in Duncan's 1974 Grand Prix automobile to the home of defendant Hunter in Union County. They went to Hunter's home to find out if he had any further information on Mr. Cato or Mr. Potts. When they arrived, Locklear and Petty stayed in the car while the others went inside. Devine showed Hunter his .9 mm. Automatic Pistol, later identified as State's Exhibit 3. Hunter wanted to trade the .25 Colt Automatic Pistol that he had received from the Atlas Construction break-in for the .9 mm. Automatic Pistol. Devine declined, saying that he would be laughed at if he tried armed robbery with a .25 Colt Automatic. As Devine, Watkins, and Duncan were getting ready to leave. Hunter told him that he would try to arrange for Mr. and Mrs. Potts to come to his house for dinner and they could go and take the money at the Potts' house, but at the time he had not found out where the Potts kept the money. Later he indicated to Watkins that they would have to catch Potts at his home because Hunter did not know where the money was. He stated that

State v. Hunter

Potts had had an eye operation and could not see well. Hunter pointed out the nearby house of Potts to them. Hunter told Devine that they were to come back to Hunter's house after the robbery if anything went wrong.

On 7 February 1975, Devine, Watkins, and Locklear were in a motel in Mecklenburg County, North Carolina. Devine was in danger of being caught concerning a breaking and entering in South Carolina, and they had to leave the motel rapidly. Later that afternoon, Devine and Watkins had a conversation with Duncan and borrowed his Grand Prix automobile. Devine, Watkins, and Locklear then left Charlotte, North Carolina, and drove to Monroe. On the way they stopped and broke into a veterinarian's office for the purpose of stealing some drugs, but stole money instead and then proceeded to the home of Potts. Watkins was driving and let out Devine and Locklear at the Potts' house. They went to the door, and Devine asked to use the telephone. He was permitted in the house with his pistol (State's Exhibit 3) under his coat. Potts came to the door, and as Mrs. Potts was about to show him the telephone, Devine thought he saw a pistol in Potts' hand. Potts grabbed at Devine's arm, and Devine started shooting. He thought Potts fired back, and Devine continued shooting. Devine did not know how many times he shot. Potts died as a result of the gunshot wounds. Mrs. Potts turned on the burglar alarm.

Devine and Locklear fled from the Potts' house to defendant Hunter's house nearby. Hunter came out and asked what was wrong. Devine said that nothing was wrong. He indicated they were supposed to meet Watkins there. Hunter asked them in, but they stayed inside only a few moments. About that time, Hunter came out and said, "Somebody has been shot. Get the hell out of my yard. I don't want nobody to see you." Devine and Locklear left by a route through the woods. When they were about 500 yards from Hunter's house, they saw Watkins drive up at Hunter's house. They were afraid to return and watched as Watkins drove away. Devine discarded his pistol and coat. They walked some six miles and were later apprehended. When Watkins drove up in the Grand Prix, he was told by Hunter to "get the hell out" and was soon apprehended near Monroe. Hunter had told Devine and Watkins to come back to his house after the "job." It was understood that Hunter was to get twenty-five percent of the money stolen.

After the shooting occurred, Mrs. Potts called her neighbors, and in turn the Hunter residence was called. Apparently this happened about the time that Devine and Locklear arrived. Neither Hunter nor his wife went to the home of Potts that evening, and neither Hunter nor his wife have been to the Potts' house since the murder. Hunter and Mrs. Potts had been reared together as children in Pageland, South Carolina.

The Sheriff's Department made a prompt investigation and, in the course of it, called Hunter about 12 o'clock that night. Hunter told the Sheriff about Devine, Watkins, Locklear, and Duncan's being at his home on the afternoon of February 7 but on that night never mentioned that Devine, Locklear, and Watkins visited his house about 10:00 p.m. that evening. The sheriff talked to Hunter again the next morning. Mrs. Hunter was not present although the sheriff understood she would be there. On this occasion Hunter told the sheriff about Devine, Locklear, and Watkins' coming by the house about 10:00 p.m., the night before. He had no particular explanation for why they came to his house at that time.

Hunter testified for the State when Devine, Watkins, and Locklear pled guilty to second-degree murder. He had previously identified them from photographs on 8 February 1975 when Sheriff Fowler was at his house.

In the course of the investigation, the pistol that Devine had discarded was located at the place he indicated. Tracks were found leading from the Potts' house to the Hunter house and away from it. The jacket of Devine was found along the route. Sunglasses that Devine had lost as he was running away were also located.

Devine and Watkins did not agree to testify against Hunter until after they had been sentenced for second-degree murder. Watkins was incarcerated in the prison camp at Lillington, and Devine was in Central Prison. Some time after Watkins was sentenced to prison, his father committed suicide because of what had happened to his son. Watkins' mother came to the prison camp and talked to him. As a result Watkins contacted Sheriff Fowler, who met with Watkins' attorney and the District Attorney at the prison camp at Lillington, whereupon Watkins proceeded to implicate defendant Hunter. Later Devine did likewise.

On 1 May 1975, a man named Richard Mears contacted the defendant at Myrtle Beach. He told the defendant that he had talked with Charles Duncan in Charlotte about purchasing stolen jewelry from Hunter. On 3 May 1975, the defendant told Mears that he wanted "to place a contract on Devine and Watkins." They discussed the terms for this proposed killing, and it was agreed that Hunter would pay Mears $5,000 to kill the two. He paid him $100 in advance for expenses. In the course of the conversation, the defendant told Mears that he had planned the robbery of Potts and that Watkins and Devine, instead of doing the robbery, broke into a store and later went berserk when they attempted to rob the "old man." Mears also discussed this "contract" with Hunter on 6 and 8 May 1975.

The State offered corroborative evidence from officers at Myrtle Beach that there were break-ins at Myrtle Beach in the summer of 1974 as Devine and Watson had testified.

Defendant's evidence tended to show:

Duncan received a telephone call from Sheriff Fowler about 11:40 p.m. on the night of the murder. The call concerned the Grand Prix automobile that Duncan had loaned Devine and Watkins. Duncan denied knowing anything of the break-ins at Myrtle Beach. Duncan had known the defendant for 4½ years. He indicated that he might see Devine and Watkins two or three days each week in the Charlotte area. He denied committing any crimes for Hunter. His business was buying and selling merchandise ranging from TV's to guns. He denied ever seeing Richard Mears. Duncan admitted to having served a total of 15½ years in prison for breaking, entering, and larceny. At the time of the murder, Duncan was wanted on a burglary charge and was running from the law. He went to the jail to see Watkins and Devine several times while they were awaiting trial. Duncan said neither Watkins nor Devine ever told him that the defendant was involved in the robbery and murder.

The defendant testified that he had operated a motel and liquor store at Myrtle Beach for the past 17 years. He had a residence south of Monroe, which he occupied during the winter months. He knew Duncan, Watkins, Devine, and Locklear. He admitted that Duncan, Watkins, and Devine stayed at his motel at Myrtle Beach but said he did not know Locklear before 7 February 1975. Duncan, Watkins, Devine, and Locklear came to his house on the afternoon of 7 February 1975. Duncan and

Watkins spoke briefly with Mrs. Hunter, who was in the bedroom. Afterwards, Duncan, Watkins, Devine, and Locklear inquired as to when the motel would open. Watkins and Devine had asked several times for work at the motel. The defendant denied any conversation about Potts with Duncan, Watkins, or Devine at any time.

Devine and Locklear came to Hunter's house between 10:00 and 10:30 p.m. on the night of 7 February 1975. They said that Watkins was supposed to pick them up. Hunter invited them in to look at television. While this was happening, his wife was on the telephone, and he heard her say "Oh, no." She ran down the hall and told him that Mr. Potts had been shot and robbed. He went back to the living room, and Devine and Locklear were gone. Potts' name had never been mentioned by them.

Shortly after Devine and Locklear left, two neighbors, Mr and Mrs. Goodall, came in and borrowed a shotgun. Shortly thereafter, Gary Watkins arrived. He rang the back doorbell and asked about Devine and Locklear. Hunter told him they had left. Nobody mentioned Potts.

Hunter had a conversation with Sheriff Fowler about midnight. He said he told Sheriff Fowler about Devine, Locklear, and Watkins' coming to his house that night and that they with Duncan had been by his house that afternoon. The next morning, Sheriff Fowler called again and wanted to see Hunter and his wife. When the sheriff and others arrived at Hunter's house, his wife, who had gone to the doctor, was not there. On this occasion, Hunter identified pictures of Devine, Locklear, and Watkins and again told the sheriff about their being there the afternoon before as well as later that night. Hunter said Devine and Watkins knew Mr. and Mrs. Potts, having met them at his house about a week before. Hunter had no knowledge of Potts' financial condition but traded at his store from time to time, changed money, and cashed checks. Hunter said that he did not go to Potts' house the next day because he was waiting for the sheriff. He had called Mrs. Potts two or three times since then, but she was never in a position to see him and his wife.

Hunter identified State's Exhibit 1, the Colt Automatic .25. He said Gary Watkins had pawned it to him at the beach for $25. This gun was kept by Hunter at the beach. Hunter admitted to having dealings with Devine and Watkins, having bought

two shotguns from them in December 1974 for $400. He admitted seeing Richard Mears on 14 May 1975 when the defendant was in the jail in Conway, South Carolina, for possession of a stolen pistol, State's Exhibit 1, but denied ever seeing him prior to that time or talking to him about killing Devine and Watkins as alleged by Mears. He also denied having ever benefited from anything stolen by Watkins or Devine and having ever discussed any crimes with them. Charles Duncan was a good friend with whom he had been out on a social basis two or three times. He did not know what Duncan's business was. Hunter said he had not been to the Potts' store for 8 weeks before Potts' death because he had a bad back. He had known Mrs. Potts since he was a small boy, and she was his friend. He denied ever discussing Potts or Cato with Devine, Watkins, or Locklear.

He said he did not go to the Potts' house on the night of the killing because his wife was sick and asked him to stay home. He did not go later because Mrs. Potts was upset. He cooperated with the sheriff. He had never been arrested for anything prior to 14 May 1975. When he paid Devine and Watkins $400 for the two shotguns in December 1974, the check was written by Mrs. Potts and made out to cash and later cashed by Duncan from a man named Ross, who had been called by Hunter.

Elizabeth Ann Hunter, the wife of defendant, said she knew Duncan, Devine, and Watkins. She was married to the Defendant in 1974. She said that at her request the defendant did not go to the Potts' house on the night of the murder because of her ill health. She talked to Sheriff Fowler the next morning but told him she had to go to the doctor.

Duncan, Devine, and Watkins had been to Hunter's house in Union County two or three times. They stayed at the motel at the beach during the summer of 1974 and always paid their bills. Mrs. Hunter was a close friend of Duncan and his girl friend. They were in and out of the motel during August and September, 1974, as well as the July 4th weekend of that year. Duncan always paid his room rent in cash. Mrs. Hunter's doctor said she did not have an appointment with him on February 8 but she came to his office.

Some witnesses from Myrtle Beach gave the defendant a good reputation.

On rebuttal State's Evidence tended to show the following: Sheriff Fowler talked with Mrs. Hunter about midnight on 7 February 1975 when she told him that Duncan, Devine, Watkins, and another man came to their house in the afternoon and she spoke with two of them briefly. However, she said nothing at that time about Devine, Locklear, and Watkins' coming back that night about ten o'clock. Neither did she tell him about going to the doctor when he talked to her on the morning of February 8. She agreed to meet him but was gone when he arrived. Two Myrtle Beach officers gave the defendant a bad reputation but admitted that he had never been arrested for anything.

It has been difficult for us to ascertain the facts from the brief of defendant and the State. The facts in defendant's brief cover 80 pages. The State's brief had no statement of facts, except as discussed in the assignments of error. We note that Rule 28(b) (2) of the Rules of Appellate Procedure, among other things, requires that the appellant's brief " . . . should additionally contain a short, non-argumentative summary of the essential facts underlying the matter in controversy where this will be helpful to an understanding of the questions presented for review." The State is not required by Rule 28(c) of the Rules of Appellate Procedure to state the facts unless there is some disagreement.

Because of the failure to comply with the rules, it has been difficult for us to glean the facts from a complicated situation.

Other pertinent facts will be discussed in the opinion.

*Attorney General Rufus L. Edmisten by Special Deputy Attorney General John M. Silverstein for the State.*

*James E. Griffin, Charles D. Humphries, Robert M. McInnis (on brief, from North Myrtle Beach, South Carolina) and Sam J. Ervin Jr., for defendant.*

COPELAND, Justice.

[1] Defendant contends that the court erred in not permitting James M. Long of the South Carolina Bar to represent Hunter at the trial. He says that this action of the trial court denied him his right to counsel under the Sixth and Fourteenth Amendments. As authority for this position he cites *United States v. Johnston,* 318 F. 2d 288 (6th Cir. 1963) and *United States v.*

*Bergamo,* 154 F. 2d 31 (3d Cir. 1946). The present case is distinguishable from these cases on the basis of its facts.

Defendant was ably represented by local counsel in Union County, Mr. James Griffin, as well as by a South Carolina attorney by the name of Mr. Ralph Stroman, who normally handled defendant's business affairs. On 18 August 1975, the date set for the trial of this case, defendant made a motion to admit counsel James M. Long to appear in the case. The trial judge made an exhaustive inquiry, and it was determined that Mr. Long was the solicitor (chief prosecuting attorney) for the Fifteenth Judicial Circuit in South Carolina, which included Horry County, in which Myrtle Beach is located. § 1-255 of the Code of Laws of South Carolina (1962) provides:

> "The solicitors may defend any persons brought to trial before any criminal courts of this State when their duty shall not require them to prosecute such persons and their assistance shall not be required against such persons by the Governor or Attorney General."

Long told the trial court that he had been retained by defendant on 5 May 1975, after having been informed by District Attorney Lowder of Union County that a bill of indictment had been returned against Hunter in Union County. Mr. Stroman had been contacted by the defendant about this matter several days before Mr. Long was contacted. Mr. Griffin was retained by defendant about 1 June 1975.

District Attorney Lowder told the trial court that Mr. Long had originally been requested to assist him in the arrest of Mr. Hunter but he received no help from Mr. Long. In fact, Long assisted Hunter in making bond on the murder charge.

Sometime after Long was retained, criminal charges were brought against defendant Hunter in Long's district. Long indicated that these cases were being handled by his assistants. The Attorney General of South Carolina filed a writ in the Supreme Court of South Carolina to restrain Mr. Long from participating in South Carolina in cases involving defendant Hunter. After Mr. Long explained that his assistants were handling the prosecution in South Carolina and that he was totally removed from the South Carolina prosecution, the matter was withdrawn by the Attorney General. At the time of this motion, however, the matter was still before Chief Justice Lewis of the Supreme Court of South Carolina.

It is well settled that an out-of-state attorney has no absolute right to practice law in another forum. It is permissive and subject to the sound discretion of the Court. *Thomas v. Cassidy,* 249 F. 2d 91 (4th Cir. 1957), *cert. denied,* 355 U.S. 958, 78 S.Ct. 544, 2 L.Ed. 2d 533 (1958) ; *Cooper v. Hutchinson,* 184 F. 2d 119 (3d Cir. 1950) ; *Parker v. Parker,* 97 So. 2d 136 (Fla. App. 1957) ; *State v. Kavanaugh,* 52 N.J. 7, 243 A. 2d 225 (1968), *cert. denied,* 393 U.S. 924, 89 S.Ct. 254, 21 L.Ed. 2d 259 (1968) ; *Manning v. Railroad,* 122 N.C. 824, 28 S.E. 963 (1898) ; *Smith v. Brock,* 532 P. 2d 843 (Okl. 1975) ; 7 Am. Jur. 2d, Attorneys at Law, § 10 (1963 and Cum. Supp. June, 1976) ; 7 C.J.S. Attorney and Client § 15 (b) (1937 and Cum. Supp. 1976).

G.S. 84-4.1 (1975 and 1975 Supp.) gives the conditions that must be met by out-of-state attorneys in order for them to be admitted to practice for limited purposes in North Carolina. Subsection 6 thereof states:

> "Compliance with the foregoing requirements shall not deprive the court of the discretionary power to allow or reject the application."

Our Court in *Manning v. Railroad, supra* at 828, 28 S.E. at 964 had this to say concerning nonresident counsel:

> "[T]he appearance of such counsel is a matter of courtesy in each and every case, and on motion in each case, and only for the occasion on which it is allowed. The statute forbids the courts from allowing non-resident counsel (when citizens of other States and not holding license from this Court) from practicing habitually in our courts, and they cannot acquire the right to do so."

In *Smith v. Brock, supra,* Oklahoma considered a rule of practice analogous to our G.S. 84-4.1. The foreign attorney had in the past engaged in disorderly and disruptive tactics in both the Oklahoma and Texas Courts. The Oklahoma Court declined to permit the out-of-state counsel to appear. The Oklahoma Supreme Court relied in part on *State v. Kavanaugh, supra,* wherein that court rejected Mr. F. Lee Bailey's contention that the defendant had a constitutional right to select an attorney who was not a member of the New Jersey Bar. In denying his right to appear, the New Jersey and Oklahoma Supreme Courts quoted with approval the following from *Thomas v. Cassidy, supra:*

" 'It is well settled that permission to a non-resident attorney, who has not been admitted to practice in a court, to appear pro hac vice in a case there pending is not a right but a privilege, the granting of which is a matter of grace resting in the sound discretion of the presiding judge. [Cases cited.]' " *Smith v. Brock, supra* at 848.

The Oklahoma Supreme Court in *Smith v. Brock, supra* at 850, also quoted with approval the following statement made in *Cooper v. Hutchinson, supra* at 122:

"The narrower question here is the extent to which an accused person's choice of counsel is a constitutional right. The argument insists that there is a constitutional right, at least in a capital case, to whatever counsel an accused person pleases to have. If that counsel is not a member of the bar of the state where the prosecution is being conducted, still, the argument runs, the accused may effectively choose him just as freely as he could choose a lawyer admitted to practice locally. The person chosen by the accused may then insist upon conducting the defense in the local courts. Control by the states over the persons who may be licensed to practice law in their courts would thus be greatly diminished in every capital criminal prosecution where the accused desires counsel from somewhere else.

"The length to which this argument takes one is startling. It has always been thought that the license to practice law is limited, except as a matter of grace, to persons who had fulfilled the local requirements for practice."

From the very beginning it is clear that Mr. James E. Griffin would be the lead counsel in the case. It is well known that Mr. Griffin is one of the leading trial attorneys in Union and surrounding counties. The District Attorney made it clear to Mr. Griffin approximately 1 June 1975 that he would object to having Mr. Long appear in the case on behalf of defendant. The trial judge permitted Mr. Stroman, defendant's personal attorney in Horry County, South Carolina, to appear with Mr. Griffin. Certainly under this set of facts, defendant cannot contend he was prejudiced by the court's decision. His constitutional right to counsel was not abridged.

It is interesting to note that the 1976 South Carolina General Assembly (recently adjourned) required all solicitors to

serve as full-time employees for the State of South Carolina effective 1 January 1977, but those in office on 1 July 1976 whose terms expired in 1979 were not required to comply during their terms. "An Act . . . To Provide That Solicitors In This State Shall Be Full Time Beginning January 1, 1977 And To Provide Exceptions. . . . " R 819, S 785. Approved the 30th day of June, 1976.

The decision of Judge Rousseau was made solely in his discretion. He acted wisely and properly to insure compliance with Canon 9 of the Code of Professional Responsibility of the North Carolina State Bar (G.S. Vol. 4A (Cum. Supp. 1975)), which states:

"A Lawyer Should Avoid Even the Appearance of Professional Impropriety." See DR9-101(B).

Canon 5 of the Code of Professional Responsibility states:

"A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." See DR 5-105.

Additionally, our law makes it a crime for a full-time district attorney to practice law. G.S. 84-2 (1975). This assignment of error is overruled.

[2] Under the second assignment of error, defendant contends that the court erred in denying the motion of defendant to continue the case in order to permit defendant to employ additional counsel.

When this motion was made, Mr. Griffin stated that it was "to allow Mr. Hunter to obtain other counsel if he so desires." There was no indication or allegation that the defendant even wished to obtain another lawyer or that other counsel was necessary to adequately prepare the defense. In fact, defendant's counsel, Mr. Griffin, declined to argue this motion. As previously noted, Mr. Griffin had been aware for more than two and one-half months that the District Attorney would object to Mr. Long's appearance in the case. It is apparent from the foregoing that defendant had ample time to arrange for the services of another attorney in addition to Mr. Stroman and Mr. Griffin if he so desired.

The constitution guarantees that the defendant and his counsel shall have a reasonable time to prepare the case for trial. *State v. Phillip,* 261 N.C. 263, 134 S.E. 2d 386 (1964),

*cert. denied,* 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed. 2d 1052
(1964) ; *State v. Lane,* 258 N.C. 349, 128 S.E. 2d 389 (1962) ;
*State v. Speller,* 230 N.C. 345, 53 S.E. 2d 294 (1949). The right
to the assistance of counsel is guaranteed by the Sixth and
Fourteenth Amendments to the U. S. Constitution and by Arti-
cle 1, §§ 19 and 23 of the North Carolina Constitution. *Powell
v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ;
*State v. Cradle,* 281 N.C. 198, 188 S.E. 2d 296 (1972), *cert.
denied,* 409 U.S. 1047, 93 S.Ct. 537, 34 L.Ed. 2d 499 (1972).
However, under the facts of this case, we do not believe any
substantial issue concerning these constitutional guarantees is
even involved. Certainly, defendant has not been prejudiced
by the court's failure to continue the case for this purpose. The
motion for continuance was properly denied. *State v. Harrill,*
289 N.C. 186, 221 S.E. 2d 325 (1976) ; *State v. Branch,* 288 N.C.
514, 220 S.E. 2d 495 (1975) ; *State v. Gibson,* 229 N.C. 497,
50 S.E. 2d 520 (1948). The assignment of error is overruled.

Under Assignments of Error 9-13, 16, 17, 19, 20, 25-32,
34-36, 38-40, defendant contends the court erred in admitting
evidence of other offenses committed by the defendant.

As a general rule, in a prosecution for a particular crime
the State cannot offer evidence tending to show that the ac-
cused has committed another distinct, independent, or separate
offense. However, this rule is subject to certain well recognized
exceptions. In the landmark case of *State v. McClain,* 240 N.C.
171, 176, 81 S.E. 2d 364, 367 (1954), the sixth exception which
we will subsequently discuss, is stated as follows:

> "6. Evidence of other crimes is admissible when it
> tends to establish a common plan or scheme embracing the
> commission of a series of crimes so related to each other
> that proof of one or more tends to prove the crime charged
> and to connect the accused with its commission. [Citations
> omitted.] Evidence of other crimes receivable under this
> exception is ordinarily admissible under the other excep-
> tions which sanction the use of such evidence to show crimi-
> nal intent, guilty knowledge, or identity."

As stated in *McClain,* for a determination of whether evi-
dence of other distinct crimes properly falls within any of the
recognized exceptions, "[t]he acid test is its logical relevancy
to the particular excepted purpose or purposes for which it is
sought to be introduced. If it is logically pertinent in that it

reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime. But the dangerous tendency and misleading probative force of this class of evidence require that its admission should be subjected by the Courts to rigid scrutiny. . . . Hence, if the Court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected." *State v. Lyle,* 125 S.C. 406, 417, 118 S.E. 803, 807 (1923) ; *accord, State v. McClain, supra* at 177, 81 S.E. 2d at 368; *State v. Gregory,* 191 S.C. 212, 221, 4 S.E. 2d 1, 4 (1938). In borderline cases the courts scrutinize whether the probative value of the evidence outweighs the undue prejudicial effect that may result. 22A C.J.S. Criminal Law § 683 (1961).

Defendant specifically objects to the State's evidence showing that the defendant was an accessory before the fact to crimes involving breaking and entering with intent to commit larceny, these crimes being committed (1) by Devine and Watkins at the home of Tony Thompson in Myrtle Beach on 21 July 1974, (2) by Duncan, Devine, and Watkins at the Atlas Construction Company in Myrtle Beach on 30 August 1974, and (3) by Duncan, Devine, and Watkins at the home of Allison Davis in North Myrtle Beach on 19 December 1974.

**[3]** The admission of the testimony to which defendant objected concerning the breaking, entering, and larceny of the Atlas Construction Company cannot be regarded as prejudicial because testimony of like import was thereafter admitted without objection when Richard Mears was testifying for the State. *State v. Swift,* 290 N.C. 383, 226 S.E. 2d 652 (1976) ; *State v. Greene,* 285 N.C. 482, 206 S.E. 2d 229 (1974) ; *State v. Van Landingham,* 283 N.C. 589, 197 S.E. 2d 539 (1973) ; *State v. Stepney,* 280 N.C. 306, 185 S.E. 2d 844 (1972). *See also State v. Carey,* 288 N.C. 254, 218 S.E. 2d 387 (1975) ; *State v. Grace,* 287 N.C. 243, 213 S.E. 2d 717 (1975). Defendant's contention that there was no requirement for him to object to the testimony of Mears on this subject because he made a "line objection" within the meaning of G.S. 1A-1, Rule 46(a)(1) (1969) is without merit. The rationale behind this rule of civil procedure is persuasive, and we might later determine that the concept of this rule is applicable in an appropriate criminal case, *e.g.,* where the trial judge sanctions the use of such con-

tinuing objections. However, this rule provides that "when there is objection to the admission of evidence involving a specified line of questioning, it shall be deemed that a like objection has been taken to any subsequent admission of evidence involving the same line of questioning." Defendant has merely taken general objections. At no time has he made an objection to a specified line of questioning so as to bring himself within the scope of the rule by asserting, for example, that the line of questions involves testimony irrelevant for stated reasons: *See generally* 1 Stansbury's N.C. Evidence, § 30 (Brandis Rev. 1973).

[4] The admission of the evidence as to the breaking, entering, and robbery of the empty safe at the Tony Thompson home and the breaking and entering with intent to steal the money in the safe at the Allison Davis home was, under the *acid test* enunciated in *State v. McClain, supra*, logically relevant for the purpose of proving the defendant's participation as an accessory before the fact to the murder of Potts in the attempted armed robbery. The defendant's participation as an accessory before the fact was a material fact in issue. In fact, this was the crucial issue going to the heart of defendant's defense.

Scrutiny of this evidence shows that it was admissible under the sixth exception to the general rule stated in *State v. McClain, supra*. Evidence of these offenses in context with other evidence showing the relationship of the defendant with the other men involved tended to establish a common plan or scheme embracing the commission of a series of larcenies so related to each other that proof of these other crimes tended to prove the crime charged and to connect the accused with its commission.

Evidence of these collateral crimes was relevant to show that, in fact, the defendant was aiding, counseling, and assisting the same group of men to serve as the instrumentalities by which the defendant profited from the larcenous scheme he concocted. The collateral crimes and the principal crime were connected by the following facts: (1) that the situs of the crimes and residences of the defendant were in close proximity (place), (2) that they occurred within a seven-month period during which the defendant and the other men were continuously in close contact (time), (3) that they were committed for the purpose of larceny (type of crime), (4) that the defendant counseled essentially the same principals, was familiar with

the targets involved, and provided the same kind of information for all of the crimes (method), (5) that essentially the same principals at the situs involved committed the crimes (principals).

A detailed analysis of the facts in this case shows that the defendant provided Watkins with the same kind of counsel and information for the Thompson and Davis crimes as he had provided to him for the Potts and Atlas Construction Company crimes. The defendant also provided Devine the same kind of counsel and information for the Thompson crime as he had provided to him for the Potts and Atlas Construction Company crimes. The evidence further indicated that Duncan was similarly informed by the defendant as to the Potts and Atlas Construction crimes. Furthermore, other evidence showing the kind of relationship that the defendant, Duncan, Devine, and Watkins had, indicated that all of them participated with the defendant in the planning of all these crimes. The defendant, Duncan, Devine, and Watkins were in close contact with each other during this seven-month period, and they were continually pursuing a common plan or scheme to commit larceny in areas in close proximity to the homes of the defendant and about which he was familiar and provided them information. On the night of the Atlas Construction Company larceny or immediately afterwards, the defendant began his discussions with Devine concerning the robbery of Mr. Potts and a Mr. Cato, who lived nearby in Pageland, South Carolina.

Other evidence showed that Devine and Watkins were principals at the situs of all the crimes. Duncan was a principal at the situs of the crimes committed against the Atlas Construction Company and Davis. Evidence of the principal crime and the collateral crimes showed that the residences of the defendant were used as places to meet for purposes of planning as well as for purposes of distributing any proceeds owed to the defendant or making a rendezvous in case of trouble.

In *State v. Grace, supra,* we held concerning that robbery case that the challenged evidence relating to three previous robberies of similar establishments by the same persons and by the use of the identical pistol in the hands of the defendant on each occasion was admissible under the sixth exception to the general rule set forth in *State v. McClain, supra.* The same principle applies in our case and renders the evidence of the collateral

offenses admissible. *See also State v. McClain,* 282 N.C. 357, 193 S.E. 2d 108 (1972) ; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969) ; *State v. Christopher,* 258 N.C. 249, 128 S.E. 2d 667 (1962) ; 22A C.J.S. Criminal Law § 683 (1961). The facts in *State v. Grace, supra,* concerned a principal at the situs rather than an accessory before the fact and the evidence of similar crimes might also have been applicable on the question of identity. Still the cases are similar in that for each crime the role and identifying characteristics of the defendant remained the same and thus tended to show the defendant's role in the principal crime.

These assignments of error are overruled.

[5]  Under Assignments of Error 41 and 42, defendant contends that the trial court erred in allowing the jury to view, and admitting into evidence, slides of the victim's wounds.

The record indicated that the trial court denied introduction into evidence of photographs but permitted the jury to view several slides on a screen in the courtroom, giving the following proper instruction:

> "These photographs, or slides, are introduced for the purpose of illustrating the Doctor's testimony, if you find that it does illustrate his testimony, and for no other purpose. They are not to be considered by you as substantive evidence, but only for the purpose of illustrating the Doctor's testimony, if you find that it does illustrate his testimony."

After this instruction was given, the doctor explained what each slide portrayed as the picture was shown on the screen. There were only 6 of these, one of the chest, one of the upper chest and face, one of the back, one of an arm, and two close-ups of the entrance wound in the chest. Each showed wounds received and appeared to be relevant upon the question of the cause of death. Under the circumstances, the fact that the slide photographs depicted a gruesome or gory spectacle does not render them inadmissible. *State v. Williams,* 289 N.C. 439, 222 S.E. 2d 242 (1976) ; *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652 (1972), *death penalty vacated,* 409 U.S. 1004, 93 S.Ct. 453, 34 L.Ed. 2d 295 (1972).

Under Assignment of Error No. 46, defendant contends the court erred in denying his motion for a nonsuit.

In considering this question, the evidence must be considered in the light most favorable to the State, and the State must receive the benefit of every inference that can reasonably be drawn therefrom. 2 Strong, N. C. Index 2d, Criminal Law, § 104 (1967 and March, 1976, Supp.)

**[6]** To convict the defendant of being an accessory before the fact the State must prove (1) that the defendant counseled, procured, commanded, encouraged, or aided another to commit the offense; (2) the defendant was not present when the crime was committed; and (3) the principal committed the crime. *State v. Branch, supra; State v. Bass,* 255 N.C. 42, 120 S.E. 2d 580 (1961).

**[7]** Defendant does not contest the fact that the evidence shows that he was not present when the crime was committed and that the principal committed the crime. Furthermore, although defendant argues otherwise, there is plenary direct as well as circumstantial evidence showing that he counseled, procured, commanded, encouraged, or aided Devine, Locklear, and Watkins to commit the offense.

The defendant told Devine that Mr. Potts of Union County kept a substantial amount of money on him or in his possession that they could steal. He also discussed Mr. Potts and the available money with Watkins and told Watkins he would help set it up for them.

When the defendant asked Devine to trade guns, Devine told the defendant that he would be laughed at if he tried armed robbery with a .25 Colt Automatic. The defendant informed Devine, Watkins, and Duncan that he planned to have the larceny occur while the Potts dined at his house, but later he indicated to Watkins that they would have to catch Mr. Potts at his home because the defendant did not know where the money was. The defendant showed Devine, Locklear, and Watkins where the Potts' home was. He told Devine and Watkins to come back to his house after the "job." It was understood that Hunter was to get twenty-five percent of the money stolen.

The above evidence, especially as supported by the defendant's admissions as testified to by Mears and the additional evidence indicated in the statement of facts, is more than ample to overcome the motion for nonsuit. This assignment is without merit and overruled.

State v. Hunter

[8]   Under Assignments of Error Nos. 47 through 54, defendant contends the trial court did not declare and explain to the jury the law arising on the evidence in the case as required by G.S. 1-180 (1969).

Defendant complains that two sentences of the court's instructions as to the elements of the crime that the State must prove in order for the jury to find him guilty failed to inform the jury that such proof must be shown by evidence establishing the enumerated elements beyond a reasonable doubt. Defendant's argument rests solely on the fact that the words "beyond a reasonable doubt" are not used in the two sentences. Defendant totally overlooks the fact that at the beginning of the charge the trial court stated that defendant "is presumed to be innocent, and the State of North Carolina must prove to you that the defendant is guilty beyond a reasonable doubt." The court then gave a complete definition of reasonable doubt. Moreover, when first listing the initial elements of the crime, the court specifically required the proof to be beyond a reasonable doubt. Similarly, at the conclusion of the charge when reciting all the elements of the crime, the court again specifically required that the proof be beyond a reasonable doubt. Finally, the court concluded, "However, if you do not so find or have a reasonable doubt as to one or more of those things, it would be your duty to return a verdict of not guilty." A charge must be read contextually, and when this is done, it is manifest that the jury understood that each element had to be proved by evidence establishing the same beyond a reasonable doubt. *State v. Branch, supra; State v. McWilliams,* 277 N.C. 680, 178 S.E. 2d 476 (1971). This contention of defendant is without merit.

[9]   Defendant argues that the court erred in failing to charge the jury that in order to find the defendant guilty as an accessory before the fact to murder, the counseling of the principal by the defendant must have had an immediate causal connection to the commission of the crime by the principal. Since, in effect, this is precisely what the charge of the court required, defendant's argument is without merit. In this case, the trial court adequately stated the three essential elements that must concur in order to justify conviction of the defendant as an accessory before the fact: (1) he must have counseled, procured, commanded, or knowingly aided Billy Devine to attempt to commit armed robbery; (2) he must have not been present when the killing and attempted armed robbery occurred; and

(3) the principal, Billy Devine, murdered William Benjamin Potts while attempting to commit armed robbery. *State v. Branch, supra; State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793 (1970) ; *State v. Bass, supra;* G.S. 14-5 (1969). Inherent in the first element as charged by this court is the requirement that the counsel, procurement, command, or aid have a causal connection to the commission of the crime. Otherwise, there would be no real counsel, procurement, command, or aid. That the trial court in fact required an immediate causal connection is most clearly shown by the final mandate of the trial court. The court charged that the jury must find the defendant not guilty unless they found that "before the killing was committed the defendant, that is, Harry Hunter, pointed out the Potts Residence and store to Billy Devine and told Billy Devine Mr. Potts had a large sum of money and told him that he couldn't locate the money and that he would have to rob Mr. Potts when he was at home, and that the defendant was to get part of the money, and that in so doing the defendant, Harry Hunter, counseled or procured, or commanded or knowingly aided Billy Devine to attempt to commit armed robbery and that the defendant was not present at the time of the killing. . . . " Since there was no special request for the particular instruction that defendant now believes should have been given, since such an instruction was in effect given, and since the question of the causal connection herein raised was not disputed or in issue under the evidence of the case (the central issue being whether the defendant counseled, procured, or commanded the principal at all), there can be no prejudice to defendant. *See generally State v. Vinson,* 287 N.C. 326, 215 S.E. 2d 60 (1975) ; *State v. Cole,* 270 N.C. 382, 154 S.E. 2d 506 (1967) (discussed herein).

Defendant maintains that the charge failed to require the jury to find that the defendant and Devine entertained the common design that Devine take money from the person or presence of the deceased by violence or intimidation and that the taking was to be done with a felonious intent. The above recitation of part of the final mandate shows that the trial court in fact required the jury to find that the defendant told Devine "that he would have to rob Mr. Potts when he was at home, and that the defendant was to get part of the money." Defendant's position is without merit because the charge that he now urges should have been given was in essence given.

Defendant asserts that the court's summary of the evidence when instructing on the law was prejudicial to defendant because it ignored and excluded evidence given by the slayer, Devine, which was favorable to defendant. This evidence was the testimony of Devine that the defendant planned for the larceny to occur while he had the Potts over to his house for dinner and the fact that Devine never testified definitely whether these plans were later changed to contemplate a robbery while the Potts were at their home. In fact, the trial court included this testimony in its recapitulation of evidence although it did not underscore the testimony that was not given. Moreover, the court omitted the testimony of Watkins favorable to the State that the defendant "changed his mind, and [said] we'd have to catch him at his home because he didn't know where the money was." Certainly, in the absence of a request for an addition to the court's recapitulation of the evidence, defendant cannot successfully maintain that there is reversible error. *State v. Rankin,* 284 N.C. 219, 200 S.E. 2d 182 (1973) ; *State v. Butler,* 269 N.C. 733, 153 S.E. 2d 477 (1967). The jury was properly instructed that it was "to decide from the evidence which you have heard what the facts are." Moreover, the final mandate to the jury that they find (from circumstantial evidence impliedly) that the defendant told Devine "that he would have to rob Mr. Potts when he was at home" placed an even greater burden on the State than required by law. If the jury determined that a conspiracy existed, it clearly would have been adequate for purposes of convicting the defendant that he have told this to Watkins and that Watkins passed this information on to Devine. Defendant has failed to show any error prejudicial to him.

Defendant additionally contends that the court failed to charge the essential elements of armed robbery or an attempt to commit armed robbery so the jury could determine (1) whether Devine murdered Potts while committing or attempting to commit an armed robbery upon him and (2) whether the defendant was an accessory before the fact to such murder. He particularly emphasizes the fact that the court failed to charge that an essential element of armed robbery is "a felonious intent" and in some sufficient form explain and define the term "felonious intent."

[10] Although the court should have spelled out the essential elements of the underlying felony of attempted armed robbery

in its instructions as to what the State must prove to convict defendant of being an accessory before the fact to felony-murder, his failing to do so was not prejudicial error for the following reasons: (1) the occurrence of the attempted armed robbery by Devine, Locklear, and Watkins was not disputed and thus not in issue under the evidence in the case, (2) defendant failed to specially request instructions on the underlying felony, (3) the court did define "attempted armed robbery" as "attempted robbery with a firearm," and (4) these latter terms were essentially self-explanatory under the circumstances of this case.

Although "reasonable doubt" is not an element of a crime, it is the standard by which all elements must be proved to the jury for defendant to be found guilty. Thus, the jury's understanding of that term is as practically important as the jury's understanding of the elements of the crime. Nonetheless, the trial judge is not required to tell the jury what "reasonable doubt" is unless requested so to do. *State v. Rankin, supra; State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971), *cert. denied,* 414 U.S. 874, 94 S.Ct. 157, 38 L.Ed. 2d 114 (1973); *State v. Ingland,* 278 N.C. 42, 178 S.E. 2d 577 (1971). In part, this is because "[t]he term 'reasonable doubt' is more easily understood than defined." *State v. Edwards,* 286 N.C. 140, 146, 209 S.E. 2d 789, 793 (1974). Additionally, this is because the term is essentially self-explanatory, as is also true for the term "attempted robbery by a firearm," especially in a functional sense so far as this jury's decision is concerned because there is no real dispute as to the "felonious intent" or the actual occurrence of the attempted armed robbery and the crime charged is accessory before the fact to murder while attempting armed robbery.

In *State v. Cole, supra,* we cited with approval the following quotation from 26 Am. Jur., Homicide § 533, at 527 (1940), "[W]here, upon the undisputed facts, it clearly and conclusively appears to a moral certainty that the unlawful act complained of was the proximate cause of death, a failure so to charge, especially where there was no request so to charge, is not reversible error." Our Court held, "There being 'no evidence tending to prove that deceased's death was due to some cause other than injuries inflicted by the accused,' an instruction on proximate cause was unnecessary, and especially when there was no request therefor." *State v. Cole, supra* at 387-88, 154 S.E. 2d at 511. This case is an example of the principle that how

much the law needs to be explained in the charge depends on the evidence presented.

*State v. Sanders,* 288 N.C. 285, 218 S.E. 2d 352 (1975), *cert. denied,* 423 U.S. 1091, 96 S.Ct. 886, 47 L.Ed. 2d 102 (1976), is another example of a case where the court's charge on an element of the crime might have raised serious problems but did not where the element complained about was not disputed or in issue under all the evidence. In that case, we stated that the court's charge as to the crime of willful and malicious damage to occupied personal property by means of explosives had portions that were not models of clarity. Defendant contended that the charge only required that there be injury to the person occupying the personal property and did not require that there be injury to the personal property. We determined that when the charge was read contextually, the court's reference to the crime as "damaging personal property, it being occupied at the time, by use of explosives" and its giving to the jury a sheet of paper immediately before they retired repeating the fact that this was the crime involved, prevented there being any prejudicial error. We also noted that "[a]ll of the evidence showed extensive damage to the automobile [the personal property] as well as serious injury to Stout [the person]."

In *State v. Vinson, supra,* defendant complained in a rape case that the trial judge failed to define "sexual intercourse" and thus failed to charge that rape required penetration by the male organ. The evidence disclosed two completed acts of intercourse, and there was no evidence to the contrary. Justice Huskins, speaking for our Court, said:

"Although defendant's plea of not guilty required the State to prove penetration beyond a reasonable doubt, the defense was not grounded on lack of penetration. Under these circumstances, the term 'sexual intercourse' conveyed the idea of completed intercourse, including penetration, and the jury must have so understood." *State v. Vinson, supra* at 342, 215 S.E. 2d at 72.

As in the case of *State v. Vinson, supra,* the element in our case that was not defined, *i.e.,* the attempted armed robbery, was essentially self-explanatory and that element was not disputed and thus not in issue under all the evidence. Defendant Hunter's defense was not grounded on the absence of attempted armed robbery and the murder resulting therefrom. Rather, it

was grounded on the contention that he did not participate in the planning of the attempted armed robbery and did not counsel, procure, or command the principals Devine, Locklear, and Watkins to commit the attempted armed robbery.

In *State v. Spratt,* 265 N.C. 524, 526-27, 144 S.E. 2d 569, 571-72 (1965), our Court enunciated the principle that while G.S. 1-180 requires the court to "declare and explain the law arising on the evidence," the comprehensiveness and specificity "of the definition and explanation of [the essential element] 'felonious intent' required in a charge [on attempted armed robbery] depends on the facts in the particular case." In that robbery case we held that the essential element of taking with "felonious intent" was defined with sufficient comprehensiveness and specificity where the court old the jury, in effect, that before they could return a verdict of guilty, they must find that defendant attempted to take the property with "intent to rob." The Court reasoned:

> " 'Rob' or 'robbery' has a well defined meaning and imports an intent to steal. [Citation omitted.] The word 'rob' was known to the common law and the expression 'intent to rob' is a sufficient definition of 'felonious intent' as applied to the robbery statute, in the absence of evidence raising an inference of a different intent or purpose." Id.

The Court therein quoted with approval the following language:

> " '[W]here the defense was an alibi and the evidence developed no issue or contention that the taking was under a bona fide claim of right or was without any intent to steal, the instructions may be upheld notwithstanding a failure to charge in specific terms with respect to an intent to steal.' 77 C.J.S., Robbery, § 49, pp. 514, 515. [Citations omitted.]" Id.

Since in our case defendant was charged with being an *accessory before the fact* to felony-murder, the need for a full definition of the underlying felony of attempted armed robbery was analogous to the need for a full definition of "felonious intent" in *State v. Spratt, supra,* where the charge was attempted armed robbery. In both cases, the jury was required to find that all the "central" elements existed, including "an attempted armed robbery" in our case and "a felonious intent" in *State*

*v. Spratt, supra.* In both cases, however, the court failed to define or charge as to all the inner elements of the central elements of the crimes charged. The fact that in the armed robbery case of *State v. Mundy,* 265 N.C. 528, 144 S.E. 2d 572 (1965) the court did not even charge the jury that in order to convict defendant as a principal, they must find the central element of "felonious intent" distinguishes that case from *State v. Spratt, supra,* and the present case.

If counsel for defendant had desired further elaboration on the term "armed robbery" or anything else, he should have requested it when the court concluded the instruction and asked counsel to step to the bench. We believe that the trial court has adequately instructed on all the substantial features of the case, and if the defendant desired a more detailed instruction as to any subordinate feature, then counsel should have made an appropriate request. This they failed to do. *State v. Vinson, supra; State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974) ; *State v. Gordon,* 224 N.C. 304, 30 S.E. 2d 43 (1944) ; *State v. Hendricks,* 207 N.C. 873, 178 S.E. 557 (1935) ; *State v. O'Neal,* 187 N.C. 22, 120 S.E. 817 (1924).

For the aforementioned reasons, defendant's assignments of error as to the charge are overruled.

Because of the serious nature of the crime for which defendant has been convicted, we have examined all the assignments of error in the record proper and find no prejudical error.

Defendant was "entitled to a fair trial but not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593, 605 (1953) ; *accord, State v. Cogdale,* 227 N.C. 59, 40 S.E. 2d 467 (1946) ; *State v. Beal,* 199 N.C. 278, 154 S.E. 604 (1930). A fair trial the defendant has had and we find

No error.

Justice EXUM concurs in result.

Justice LAKE dissenting.

The defendant appeals from a sentence to imprisonment for life for the crime of being an accessory before the fact to a murder committed in the perpetration of an attempt to commit

robbery with a firearm. The jury found him guilty of that offense. The evidence fully supports the verdict. There was no prejudicial error in the admission of that evidence. There was, however, error in the failure of the trial judge to instruct the jury as to all the elements of the offense with which the defendant was charged and of which he was convicted. This the trial judge was required to do by G.S. 1-180.

The judge instructed the jury:

"Now, the defendant was originally charged with murder in the first degree. However, you will not be called upon to find the guilt or innocence of the defendant on this charge, but you will be called upon to find the guilt or innocence of the defendant on a lesser included offense, that is, accessory before the fact of murder in the perpetration of attempt to commit robbery with a firearm, commonly called armed robbery, *the meaning of which I will explain to you later on.* (Emphasis added.)

\*     \*     \*

"Now, lady and gentlemen, as I said, the defendant has been accused of accessory before the fact of murder in the perpetration of an attempt to commit robbery with a firearm, which in common language is armed robbery.

"Now, I charge that for you to find the defendant guilty as an accessory before the fact of murder in the perpetration of attempted robbery with a firearm, the State must prove the following things beyond a reasonable doubt. First, the State must prove and prove beyond a reasonable doubt that murder in the perpetration of attempted armed robbery was committed by Billy Devine. Now, in order to find that Billy Devine committed murder in the perpetration of an armed robbery, the State must prove 2 things beyond a reasonable doubt, that is, that Billy Devine shot William B. Potts while committing or attempting to commit armed robbery, and, second, that the shooting proximately caused William Benjamin Potts' death.

\*     \*     \*

"So I repeat, in order to find the defendant guilty of this charge, you first must find that murder in the perpetration of attempted robbery was committed by Billy Devine, and in order to find that you must find Billy

Devine shot Mr. Potts while committing or attempting to commit armed robbery, and that the shooting proximately caused Mr. Potts' death.

"Coming back to what the State must prove, again, that before the crime was committed, the defendant, that is, Harry Hunter, counseled, procured, commanded or knowingly aided Billy Devine to commit or attempt to commit armed robbery. And finally, the State must prove that the defendant was not present when the killing of William Benjamin Potts occurred.

\*   \*   \*

"Therefore, lady and gentlemen, I charge if you find from the evidence beyond a reasonable doubt that on or about February 7, 1975, Billy Devine committed murder in the perpetration of attempt to commit robbery, that is, that Billy Devine shot William Benjamin Potts while attempting to commit armed robbery and the shooting proximately caused William Benjamin Potts' death and that before the killing was committed the defendant, that is, Harry Hunter, pointed out the Potts residence and store to Billy Devine and told Billy Devine Mr. Potts had a large sum of money and told him that he couldn't locate the money and that he would have to rob Mr. Potts when he was at home, and that the defendant was to get part of the money, and that in so doing the defendant, Harry Hunter, counseled or procured or commanded or knowingly aided Billy Devine to attempt to commit armed robbery and that the defendant was not present at the time of the killing, it would be your duty to return a verdict of guilty of accessory before the fact of murder."

In a charge otherwise free from error the trial judge inadvertently failed to instruct the jury as to the elements of the offense of robbery, the underlying felony which made the killing of Mr. Potts murder.

Since robbery (or attempt to rob) is an essential element of the offense for which the defendant was put on trial, G.S. 1-180 required the judge to instruct the jury as to the elements of robbery. We may not lawfully assume that this was nonprejudicial error on the theory that everyone knows what robbery is. No such assumption may lawfully be made when a defendant is charged with the crime of robbery itself. See:

*State v. Logner,* 269 N.C. 550, 551, 153 S.E. 2d 63 (1967) ; *State v. Fulford,* 124 N.C. 798, 32 S.E. 337 (1899). Similarly, no such assumption may lawfully be made when he is charged with a crime of which robbery is an essential element.

"A correct charge is a fundamental right of every accused." *State v. Orr,* 260 N.C. 177, 181, 132 S.E. 2d 334 (1963). As Justice Barnhill, later Chief Justice, said in *State v. Friddle,* 223 N.C. 258, 261, 25 S.E. 2d 751 (1943), "The chief object contemplated in the charge of the judge is to explain the law of the case, to point out the essentials to be proved on the one side and on the other, and to bring into view the relation of the particular evidence adduced to the particular issue involved." G.S. 1-180 confers upon litigants, including defendants charged with crime, a substantial legal right to have the jury instructed as to the law upon all substantial features of the case. *State v. Everette,* 284 N.C. 81, 199 S.E. 2d 462 (1973) ; *State v. Brady,* 236 N.C. 295, 72 S.E. 2d 675 (1952) ; *State v. Ardrey,* 232 N.C. 721, 62 S.E. 2d 53 (1950). The judge must charge the jury as to what constitutes the essential elements of the offense for which the defendant is brought to trial. *State v. Hairr,* 244 N.C. 506, 94 S.E. 2d 472 (1956).

To convict the defendant of the offense of being an accessory before the fact to a murder committed in the perpetration of an attempt to commit robbery, the jury would have to find that the killing was committed in the course of an attempt to commit robbery. To so find, the jury would have to know what constitutes robbery. The instructions given the jury do not contain any definition of that offense.